650 F.2d 293
 208 U.S.App.D.C. 399, 6 Media L. Rep. 1909
 UNITED STATES of America
v.
Mary Sue HUBBARD et al., Appellants.
UNITED STATES of America
v.
Mary Sue HUBBARD et al.
Church of Scientology of California, Appellant.
CHURCH OF SCIENTOLOGY OF CALIFORNIA, Appellant,
v.
UNITED STATES of America et al.
 Nos. 79-2312, 79-2313 and 79-2324.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 21, 1980.
Decided July 24, 1980.
Supplemental Opinion Feb. 9, 1981.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Criminal No. 78-401 and D.C. Civil Action No. 79-2975).
 Earl C. Dudley, Jr., Washington, D. C., with whom Michael Nussbaum, Washington, D. C., was on brief, for appellants Hermann and Raymond.
 Leonard B. Boudin, New York City, was on brief, for appellant Hubbard.
 Philip J. Hirschkop, Alexandria, Va., was on brief, for appellants Heldt and Snider.
 Roger Zuckerman, Washington, D. C., was on brief, for appellants Weigand and Willardson.
 John Kenneth Zwerling, Alexandria, Va., was on brief, for appellant Wolfe.
 Leonard J. Koenick, Washington, D. C., was on brief, for appellant Thomas.
 Leonard B. Boudin, New York City, for appellant Church of Scientology of California.
 Steven C. Tabackman, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Carl S. Rauh, Principal Asst. U. S. Atty., John A. Terry, John R. Fisher, Keith A. O'Donnell, Michael W. Farrell, Raymond Banoun, Judith Hetherton and Timothy J. Reardon, III, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.
 George K. Rahdert, St. Petersburg, Fla., and James L. Yacavone, III, Clearwater, Fla., were on brief, for amici curiae Clearwater Newspapers, Inc. and Times Publishing Co.
 Also, Ronald G. Precup, Washington, D. C., entered an appearance, for appellants Hermann and Raymond.
 Leonard S. Rubenstein and Geraldine R. Gennet, Alexandria, Va., entered appearances, for appellants Heldt and Snider.
 Roger Spaeder and Lawrence A. Katz, Washington, D. C., entered appearances, for appellants Weigand and Willardson.
 Richard McMillin, Washington, D. C., entered an appearance, for appellant Thomas.
 Before ROBINSON, MacKINNON and WALD, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Dissenting opinion filed by Circuit Judge MacKINNON.
 WALD, Circuit Judge:
 
 
 1
 We confront the issue here of whether and on what grounds a district court judge may make available to the public papers seized from a third party nondefendant, subsequently introduced under seal only in a pretrial suppression hearing and only for the purpose of showing that the search and seizure were unlawful. As far as we have been able to determine, there is no precedent on the issue. The seized documents were made available to the public on the eve of the defendants' convictions under a disposition agreement and at a time when the trial judge's ruling denying suppression of the seized materials was certain to be appealed. Three reasons were given for making these documents publicly available: "there is a right in the public to know what occurs before the courts;" "there is a public interest in access to court records;" and "sunshine is the best disinfectant."[1] When the unsealing decision was announced, the third party nondefendant sought but was denied leave to intervene to assert its interest in retaining the documents under seal. It then moved the court for immediate return of the documents and for an order temporarily enjoining public access pending their return. These motions were also denied.
 
 
 2
 After studying the matter in depth, we have determined to stay the unsealing orders appealed in No. 79-2312, to vacate the orders denying intervention and temporary injunctive relief appealed in Nos. 79-2313 and 79-2324,[2] and to remand to the trial court for supplemental proceedings and transmission to this court of a more particularized rationale, under guidelines discussed below. We retain jurisdiction over the matter and order all documents at issue here sealed pending our decision following remand.[3]
 
 I. BACKGROUND
 
 3
 Owing to the litigiousness of the parties the full procedural background of these appeals is quite complex, but the essential facts are simply stated. Close to three years ago the government seized approximately 50,000 documents[4] from two Los Angeles sites of the Church of Scientology of California. A motion made by the Church to return the documents was dismissed by a federal district court in California,[5] although various actions of the parties and the courts in California restricted public access to the documents held by or subject to the proceedings of that court.[6]
 
 
 4
 More than two years after the seizures a District of Columbia grand jury returned indictments against eleven officials or employees of the Church. Seeking to suppress the seized documents as the fruits of an illegally executed "general" search, the nine defendants present before the court[7] urged Judge Richey, to whom the criminal case was assigned, to examine a complete set of the documents seized. Because they were needed for this purpose, copies of all documents held by the district court in California were transferred to the custody of the district court here. From the discussions preceding transfer it is clear that everyone concerned was under the impression that all documents to be transferred would be held under seal by the clerk of this court.[8] No separate written sealing order was entered, but before the transfer took place, Judge Richey entered repeated oral sealing orders,[9] although usually with the caveat that he retained the right to "unseal" the documents at a later time.[10]
 
 
 5
 The legal consequence of the position taken by the defendants in pressing the full set of documents upon the trial judge during the suppression hearing is that the documents became part of the "record" of the case.[11] We think this conclusion is consist ent with the contemporaneous understanding of the parties and the district court.[12] However, only a small number of the documents were referred to individually by nature or content by either witnesses in the suppression hearing or by the trial judge in his ultimate decision on the motion.[13] It is in fact unclear whether and to what extent the trial judge examined the documents before he denied defendants' suppression motion.[14]
 
 
 6
 Shortly after entry of the decision upholding the search, the government and the defendants negotiated a disposition of charges and a stipulated record consisting of approximately 200 documents. As part of the negotiations the government agreed not to disseminate publicly any documents seized which were not part of the stipulated record. The trial court enforced the negotiated disposition;[15] the case was tried to the bench on the stipulated record and guilty verdicts were returned.[16]
 
 
 7
 After the disposition agreement was enforced but one day before the guilty verdicts were entered, the trial judge issued an order making publicly available all documents seized except those that the government had earlier "returned" to the Church as unnecessary to the prosecution,[17] if they were not also used by the defendants in the examination of witnesses at the suppression hearing.[18] When this order was filed, the Church sought to intervene in the criminal case to "protect the constitutional rights of the Church and its members in the privacy of their papers;"[19] it also filed a motion captioned as a separate civil proceeding, seeking immediate return of the seized documents and an order temporarily restraining the court clerk from disseminating or disclosing the documents to anyone pending a decision on the motion for return.[20] The individual defendants moved the court for reconsideration. These motions were denied. Applications by the Church and the individual defendants for stay of the unsealing order and a petition by the Church for mandamus relief were denied by motions panels of this court. Rehearing en banc of the stay applications was also denied, no judge having called for a vote on the application for rehearing. Finally Chief Justice Burger denied applications for stay submitted to him as Circuit Justice.
 
 
 8
 Before us now are the consolidated appeals from the orders entered in the district court. We do not understand either the Church or the individual defendants seriously to contest the "unsealing" of documents which are part of the stipulated record or which were used by defendants in the examination of witnesses at the suppression hearing or which were referred to by the trial judge in his opinion on the motion to suppress.[21] At issue, then, is the substantive and procedural propriety of the judge's orders with respect to the balance of the documents unsealed.[22]
 
 
 9
 II. THE PROCEDURAL RIGHTS OF THE CHURCH AND THE INDIVIDUAL DEFENDANTS
 
 A. Introduction
 
 10
 At the outset we are called upon to determine the appealability of the orders entered in the district court. In our judgment a determination of the orders' appealability turns on a proper understanding of the interests asserted in the district court and on the relationship of these interests to the criminal investigation and prosecution to which they are undeniably connected. We thus turn our attention first to an examination of the nature of the interests asserted in the district court, the procedures attempted to be employed for the assertion of those interests and the procedures which could have been employed, given our assessment of the nature of the interests asserted and their relationship to the criminal case. We then return to the question of the appealability of the orders entered in the district court.
 
 
 11
 B. Procedural Rights of the Church in the District Court
 
 1. The Nature of the Church's Interests
 
 12
 We think the kinds of interests raised by the Church in its effort to protect the confidentiality of documents seized from its premises are sufficiently strong to mandate the identification of some procedural mechanism by which those interests can be presented contemporaneously to the court that controls public access to the records of which the documents became a part. Our evaluation of the strength of the interests sought to be asserted by the Church derives from an analysis of the Church's asserted property rights in the seized documents and from our recognition of the intrusion by government officials upon the Church's privacy which a compulsory search of Church premises may represent and the compounding of this intrusion that is worked by public access to the contents of the documents seized.
 
 
 13
 Although we decline the Church's invitation expressly to ground the Church's protectible interests in the Constitution's provisions, we find the kinds of interests asserted to have some constitutional footing, both cognate to and supportive of, constitutional rights.[23] This understanding has framed our consideration of both the procedural and the substantive questions raised in these appeals and has contributed substantially to the conclusions we have reached.
 
 
 14
 Prior decisions of this court have made clear that the party from whom materials are seized in the course of a criminal investigation retains a protectible property interest in the seized materials. "(T)he Government's right to seize and retain certain evidence for use at trial," we have said, " 'does not in itself entitle the State to its retention' after trial, . . . ."[24] Rather, as we have declared, "it is fundamental to the integrity of the criminal justice process that property involved in the proceeding, against which no Government claim lies, be returned promptly to its rightful owner."[25] Lawful seizure of the property, of itself, may affect the timing of the return,[26] but never the owner's right to eventual return. "(T)he district court, once its need for the property has terminated, has both the jurisdiction and the duty to return the . . . property . . . regardless and independently of the validity or invalidity of the underlying search and seizure."[27]
 
 
 15
 Both in the district court here and in the Central District of California the Church has asserted entitlement to lawful possession of the documents seized and a corresponding right to their return.[28] In the court below this claim was coupled with a request for injunctive relief retaining the documents under seal pending their return. Otherwise, the Church argued, "the ultimate granting of (the) motion (for return of property) will be a meaningless achievement."[29] The Church continued, "The publication of the documents invades the right of privacy of the petitioner and its members, violates the petitioner's Fourth Amendment rights, and chills the rights of and free exercise of religion. This damage cannot be undone by the eventual return to petitioner of its property."[30]
 
 
 16
 The privacy interests asserted by the Church in its application for injunctive relief pending the documents' return were also asserted in its motion to intervene in the criminal case. In those papers the Church relied not only on the property interests which it retained in the seized documents but on the violation of its right of privacy which release of the seized documents would effect.[31] Although adverting to the confidential nature of the information contained in certain of the seized documents, the Church asserted a privacy interest not in particular documents but in the documents as a whole,[32] relying, inter alia, on the fact that the materials seized were documents, on the circumstances under which they were seized, on the measures theretofore taken by the parties to preserve the documents' confidentiality, and on the fact that the defendants were certain to appeal their criminal convictions on the grounds of the lawfulness of the search and seizure.[33]
 
 
 17
 That the fourth amendment which is now recognized to protect legitimate expectations of privacy[34] can be invoked by corporations to suppress the fruits of a search of corporate premises[35] demonstrates an understanding that a compulsory search of even corporate premises may constitute an intrusion upon privacy.[36] Furthermore, the Supreme Court has recognized an obligation on the part of the courts to take some measures to protect even a suspected criminal's privacy. The special difficulties of document searches in this connection have been noted. In Andresen v. Maryland,[37] the Court stated:
 
 
 18
 We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. Similar dangers, of course, are present in executing a warrant for the "seizure" of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.
 
 
 19
 However, the value assigned by our society to protection against governmental invasions of privacy is not measured solely by the fourth amendment's exclusionary rule. The fourteenth amendment's protection against arbitrary or unjustifiable state deprivations of personal liberty also prevents encroachment upon a constitutionally recognized sphere of personal privacy.[38] The fifth amendment's protection of liberty from federal intrusion upon this sphere can be no less comprehensive.[39]
 
 
 20
 Minimizing the initial intrusiveness of necessary governmental activity is one means of serving fundamental privacy interests, but controlling broadside disclosure of materials or information obtained by intrusive means is another.[40] For example, on at least two recent occasions Congress has recognized that the dissemination of information compounds whatever infringement of privacy occurs when materials or information are obtained through compulsory means.[41] The need for both kinds of protection has been perceived by state legislatures as well as by the Congress.[42]
 
 
 21
 Finally, although the scope of the privacy interests protected by the Constitution differ from the privacy interests protectible under state law,[43] the concept of a protectible right of privacy has found widespread acceptance in the state law of this country,[44] and has been embraced both in the District of Columbia[45] and in California.[46] ] Whether and to what extent the privacy interests protected by state law may be asserted by corporate bodies is still unsettled.[47] However, we think one cannot draw a bright line at the corporate structure. The public attributes of corporations may indeed reduce pro tanto the reasonability of their expectation of privacy,[48] but the nature and purposes of the corporate entity and the nature of the interest sought to be protected will determine the question whether under given facts the corporation per se has a protectible privacy interest.[49] Moreover at least certain types of organizations corporate or non-corporate should be able to assert in good faith the privacy interests of their members.[50] Finally, whether acting for itself or on behalf of its members, surely the privacy interests of a "church" must be assessed somewhat differently from the privacy interests of other sorts of "corporations."[51]
 
 
 22
 Because state law privacy rights are seldom litigated,[52] their contours remain unclear and application of these still-evolving concepts to the claims here stated cannot be determined by reference to already decided cases. However, in our judgment the combination of property and privacy interests asserted were significant enough to warrant an opportunity for the Church to state its interests in the only forum where meaningful relief could expeditiously have been had[53] and within whose supervisory discretion a decision to foreclose public access resides.[54]
 
 
 23
 2. Procedural Mechanisms for the Church's Assertion of Interest
 
 
 24
 a. Ancillary Jurisdiction
 
 
 25
 Our decisions make plain that a federal trial court has ancillary jurisdiction to hear and determine claims closely related to and arising out of the criminal proceedings brought before it.[55] We think this concept of ancillary jurisdiction is flexible enough to accommodate claims relating to seized property, even when made by strangers to the criminal case.[56] We thus conclude that the trial court had jurisdiction to hear the claims made. However, this conclusion does not imply the proper method by which the claim should be presented, and to that question we turn below.
 
 
 26
 b. Analysis of the Procedures Employed and Available
 
 
 27
 The means by which third parties have sought to assert their interests in criminal cases have been manifold.[57] Indeed, the Church here chose to employ three of the mechanisms which have been used, with varying success, by other parties in other cases.[58] It first sought to intervene in the criminal case, it then brought a motion for return of property, accompanied by an application for an order temporarily restraining public access to the documents at issue. Finally, it petitioned this court for a writ of mandamus directing the district court, inter alia, "to refrain from unsealing for public inspection"[59] the documents at issue.
 
 
 28
 Of these methods we think the last employed was neither appropriate nor adequate to the task. It is the trial court and not this court that should engage in the initial consideration of the interests at stake, especially where, as here, the matter is urgent and largely dependent on an extensive record with which the trial judge is intimately familiar.[60] Even assuming mandamus relief is available to non-parties in a criminal proceeding,[61] we think the inevitable delay in seeking a writ and the narrow circumstances under which it will be granted[62] render it inadequate to redress the type of injury here alleged and mandate the identification of some other means by which a non-party's interest may timely be presented to the district court whose actions are alleged to affect that interest.
 
 
 29
 Of the two other methods by which the Church attempted to assert its interests, we think the motion for return of property and the accompanying application for temporary injunctive relief most closely approximated a proper means by which the trial court's ancillary jurisdiction could have been invoked by the Church to present its claims to retain the documents under seal.[63] In our view the Church could have proceeded by simple motion, served on the parties in the criminal case, under the caption of that case.[64] We think such a motion would have served the Church's interests adequately and we treat the Church's efforts in the district court as having commenced such a proceeding.[65]
 
 
 30
 It has long been recognized that a summary proceeding initiated simply by motion to the court of trial is ordinarily suitable for the purpose of asserting an interest in the ultimate disposition of property seized in a criminal proceeding.[66] We now hold that it is also appropriate for the purpose of the presumptive owner's assertion of interest in maintaining the confidentiality of documents so seized.
 
 
 31
 The availability of this ancillary, summary proceeding and our treatment of the Church's efforts as having commenced such a proceeding make it unnecessary either to decide the procedural propriety of the methods in fact employed by the Church in its efforts in the district court to retain the documents under seal, or to address the question whether one may ever intervene in a criminal case.[67] Furthermore, because we think the Church was in fact heard on the merits in its efforts to retain the seized documents under seal,[68] and because the district court's rationale for denying relief, insofar as it can be ascertained on this record, turned at least in part on the merits of the interests asserted,[69] we treat the orders appealed by the Church as having reached the merits and will consider the remainder of the issues raised by those appeals accordingly.
 
 
 32
 C. Procedural Rights of the Individual Defendants
 
 
 33
 The individual defendants, though on different grounds, also protested public access to the seized documents and, with one minor exception, their claims, like the Church's, fell within the trial court's ancillary jurisdiction in criminal cases, as we interpret that concept.[70] This is because the claims, though closely related to the criminal proceedings, were separable from them; their determination did not require the district court and will not require us to decide questions inextricably intertwined with the propriety of the criminal conviction. This conclusion reflects our assessment of the separability from the criminal proceeding of the claims raised on their face; but it also inevitably reflects our judgment on the merits that the interests asserted can and should be evaluated independently of the defendants' motion to suppress the fruits of the search of Church premises.
 
 
 34
 The one claim made that cannot be divorced from the criminal proceedings themselves was that release of the documents violated the negotiated plea disposition.[71] We do not consider this claim to fall within the trial court's ancillary criminal jurisdiction. Accordingly, we do not address it, but leave it for consideration on appeal from the criminal conviction if the defendants wish to raise it at that time.
 
 
 35
 A brief summary of the remaining interests asserted by the individual defendants will demonstrate their ancillary nature. The defendants argued: that publication would vitiate the benefits of possible reversal of their convictions on appeal; would interfere with the proceedings commenced and orders entered in the federal courts in California; would prejudice fair trial rights in other criminal proceedings; and would violate the privacy rights of individuals mentioned or discussed in the seized documents.[72] None of these claims is inextricably bound up in an assessment of the validity of the judgment of conviction. Even the "fair trial" rights assertedly jeopardized by public access to the documents at issue presented an ancillary question. This is because the defendants did not seek to protect from unfair publicity the proceedings then in being but rather any subsequent proceedings in which they or other indicted individuals might be defendants.
 
 D. Appealability
 
 36
 The "ancillary" nature of the interests asserted by both the Church and the individual defendants and the practical finality of the contested orders determines the question of their appealability.[73] The analogy to the appealable "collateral order" doctrine of Cohen v. Beneficial Industrial Loan Corp.[74] is strong and persuasive. Like the orders which are the subject of that doctrine the orders entered here are "separable from, and collateral to"[75] the rights of the parties to the criminal proceedings. Furthermore, because public access to the documents at issue will to some extent irreparably damage the interests asserted, an order which has the effect of permitting such an invasion, as a practical matter, "finally determine(s)" the claim.[76] Our consideration of the issues raised will neither halt nor disturb the orderly progress of the criminal proceeding.[77] We are thus satisfied that these issues are properly before us and turn to consideration of the merits of the district court's decision to unseal the documents at issue.
 
 III. THE MERITS OF THE UNSEALING ORDER
 
 37
 We begin by recognizing this country's common law tradition of public access to records of a judicial proceeding.[78] Access to records serves the important functions of ensuring the integrity of judicial proceedings in particular and of the law enforcement process more generally.[79] But as the Supreme Court noted in Nixon v. Warner Communications, Inc.,[80] the tradition of access is not without its time-honored exceptions:
 
 
 38
 Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, or as sources of business information that might harm a litigant's competitive standing.
 
 
 39
 (citations omitted). The public has in the past been excluded, temporarily or permanently, from court proceedings or the records of court proceedings to protect private as well as public interests: to protect trade secrets,[81] or the privacy and reputation of victims of crimes,[82] as well as to guard against risks to national security interests,[83] and to minimize the danger of an unfair trial by adverse publicity.[84] In addition, both Congress and the courts have recognized that for certain purposes records of arrests and even of convictions may be expunged by action of the court.[85]
 
 
 40
 The Supreme Court has recently identified a first amendment right of access in the public to the conduct of a criminal trial, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), but whether this right extends to the conduct of a pretrial suppression hearing,[86] and, if so, what factors may be found weighty enough to permit complete or partial closure of such proceedings,[87] is not clear. In any event, we deal here not with the closure of courtroom proceedings but with the sealing of documents whose contents were not specifically referred to or examined upon during the course of those proceedings and whose only relevance to the proceedings derived from the defendants' contention that many of them were not relevant to the proceedings, i. e., that the seizure exceeded the scope of the warrant.
 
 
 41
 The Court's decision in Richmond Newspapers has not cast doubt on its earlier conclusion that "the right to inspect and copy judicial records is not absolute;"[88] nor do we read it to have undermined its conclusion, based on then available law, that "the decision as to access (to judicial records) is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."[89] In the analysis that follows we explain why under the facts and circumstances of this case we think the unsealing order was flawed and why we must remand for supplemental proceedings.
 
 
 42
 A. The "Generalized Interests" for and Against Public Access in This Case
 
 
 43
 Some aspects of the public's interest in access and of the appellants' interests in denying public access can be weighed without examining the contents of the documents at issue. In the remainder of this opinion these aspects of the competing interests involved in this case are referred to as the "generalized interests" at stake.
 
 
 44
 We acknowledge an important presumption in favor of public access to all facets of criminal court proceedings but we conclude that on the record now before us an assessment of the generalized interests here at stake does not support a conclusion that the documents at issue should not be retained under seal.
 
 
 45
 We cannot determine from the trial judge's orders what factors entered into his initial decision to unseal or even if he found a weighing of these generalized interests appropriate. For this reason alone we must remand. However, taken as having weighed only the generalized interests, we think the unsealing decision was an abuse of discretion. Compelling this conclusion in this case is an analysis of several relevant factors discussed under separate subheadings below.
 
 
 46
 1. The Need for Public Access to the Documents at Issue
 
 
 47
 Under this heading we bring together several considerations which in our judgment bear upon the precise weight to be assigned in this case to the always strong presumption in favor of public access to judicial proceedings. Some of these considerations have already been mentioned and others, because they also bear on the reasons why public access might be denied, will be emphasized again later.
 
 
 48
 We first note that this case does not involve access to the courtroom conduct of a criminal trial, recently found by the Supreme Court to be constitutionally protected.[90] Nor does it involve access to the courtroom conduct of a pre-trial suppression motion, access the Court a year earlier ruled the sixth amendment alone did not protect.[91] It does not involve access to documents which have been introduced as evidence of guilt or innocence in a trial,[92] nor even documents whose contents have been discussed or insofar as we can determine relied upon by the trial judge in his decision on the defendants' motion to suppress. As we emphasize below,[93] it concerns only access to documents introduced by the defendants solely to show the overbreadth of a search whose lawfulness, although decided by the trial judge in the government's favor, was certain to be appealed at the time the unsealing order was entered.[94]
 
 
 49
 The public in this case had access, inter alia, to the courtroom proceedings on the motion to suppress, to the memoranda filed by the parties in connection with that motion, to the trial judge's memorandum decision on the suppression motion, to the trial judge's memorandum decision on the negotiated disposition, to the stipulated record which was the basis for the defendants' convictions and to the actual "trial" of the criminal charges of which the defendants were convicted. None of the documents at issue here was either used in the examination of witnesses during the protracted public hearing on the suppression motion or specifically referred to in the trial judge's public decision on the motion to suppress or included as part of the publicly available stipulated record on which the defendants' criminal convictions were had.[95]
 
 
 50
 Under all these circumstances we conclude that the purposes of public access are only modestly served by the trial judge's unsealing decision.
 
 2. Public Use of the Documents
 
 51
 Although the materials at issue are part of the "record" of the proceedings, their contents were not publicly revealed until the court entered its unsealing order.[96] Previous access is a factor which may weigh in favor of subsequent access. Determining whether, when and under what conditions the public has already had access to court records in a given case cannot of course guide decision concerning whether, when and under what conditions the public should have access as an original matter. However, previous access has been considered relevant to a determination whether more liberal access should be granted to materials formerly properly accessible on a limited basis through legitimate public channels[97] and to a determination whether further dissemination of already accessible materials can be restrained.[98]
 
 
 52
 The record in this case reveals no such access to the documents until the district court decided that there was "a right in the public to know."[99] There is thus no previous access to weigh in favor of the access granted through the district court's unsealing order.
 
 
 53
 3. Fact of Objection and Identity of Those Objecting to Disclosure
 
 
 54
 Strong objections were raised to the unsealing order both by the individual defendants and, to the extent it was permitted, by the Church. This is an obvious but important consideration. The kinds of property and privacy interests asserted by the Church to require retention of the documents under seal can be waived by failure to assert them in timely fashion,[100] and the strength with which a party asserts its interests is a significant indication of the importance of those rights to that party.
 
 
 55
 An important element in this case is the fact that the party from whom the documents were seized was not made a defendant in the proceedings and now objects to public access to the fruits of the seizure. We think that where a third party's property and privacy rights are at issue the need for minimizing intrusion is especially great and the public interest in access to materials which have never been judicially determined to be relevant to the crimes charged is especially small.[101]
 
 
 56
 We are well aware that all defendants here were officials or employees of the Church and that the defendants' interests and the Church's interests are integrally related; nonetheless it is also true that their interests are not identical. The defendants might not be permitted[102] and are certainly not required to raise the Church's interests in preventing public access to the documents at issue. Even in the context of this case, then, we think the fact that objection to access is made by a third party weighs in favor of non-disclosure.
 
 
 57
 4. Strength of the Generalized Property and Privacy Interests Asserted
 
 
 58
 That the documents were seized from non-public areas of Church premises is undisputed. Accordingly, the Church's "standing" to assert the kinds of generalized interests which derived from the fact of seizure from its premises-interests which we have discussed above in connection with the Church's procedural rights[103]-is unquestionably strong.[104] By this we mean its interest on this record is direct and substantial, substantial enough, given the other factors to be considered in weighing the generalized interests in public access against the generalized interest in nondisclosure here asserted, to require retention of the documents under seal.
 
 
 59
 The "standing" of the individual defendants to assert these generalized interests in the documents at issue is less clear. Because the Church's asserted interests are strong and the defendants assert no conflicting interest, we need not determine the precise scope of the individuals' generalized interests in the retention of the documents under seal. We note, however, that the defendants' standing to assert certain of these generalized property and privacy interests may be broader than the scope of their "standing" to object to an unlawful search and seizure.[105]
 
 5. Possibility of Prejudice
 
 60
 Two defendants whose extradition has only recently been accomplished remain to be tried. In addition, the government has the right to try the nine convicted defendants on any of the remaining counts should their single-count convictions be overturned on appeal. Thus, the possibility of prejudice to the defendants by sensational disclosure is a factor which may weigh in favor of denying immediate public access.[106] The likelihood of prejudice will in turn depend on a number of factors, including, most importantly, the nature of the materials disclosed. Until such an examination is undertaken, the weight of this factor cannot be determined. The trial judge's conclusion that the possibility of prejudice is remote[107]-ostensibly reached without complete familiarity with the documents-cannot, therefore, favor public access.
 
 
 61
 6. The Purposes for Which the Documents Were Introduced
 
 
 62
 The single most important element in our conclusion that the proper balance has not been struck in this case is the fact that the documents at issue were introduced by the defendants for the sole purpose of demonstrating the unlawfulness of the search and seizure. Whatever the purposes served by the exclusionary rule, the fundamental thrust of the fourth amendment is at bottom the protection of privacy and property interests.[108] Putting aside for the moment the prospect of untoward invasions of third-party interests, it would be ironic indeed if one who contests the lawfulness of a search and seizure were always required to acquiesce in a substantial invasion of those interests simply to vindicate them.[109]
 
 
 63
 It must be remembered that the documents here were not determined by the trial judge to be relevant to the crimes charged; they were not used in the subsequent "trial"; nor were they described or even expressly relied upon by the trial judge in his decision on the suppression motion. Their only use by the parties and the only purpose for which they were admitted in the criminal proceedings was to assist the court in its determination of whether the search and seizure were unlawfully overbroad. If such a connection with the proceedings were enough by itself to justify public access, there would be very little left of fourth amendment and common law rights to privacy. For, by the act of attempting to show the excesses of the search by the extent of the documents seized-documents which may not be relevant to criminal charges or necessary to trial-defendants in criminal proceedings and nondefendant owners in Rule 41(e) proceedings will invite public dissemination of the contents of the documents and thereby impair the very privacy rights they seek to vindicate, regardless of the use ultimately made of the documents by the court.
 
 
 64
 The risk is especially grave in document searches not only because the protected position occupied by personal papers has traditionally been closely guarded[110] but because determination of a claim of overbreadth may require the court to examine the documents' contents. However, in this case it is not clear that such an examination was undertaken in the course of ruling on the suppression motion; the unsealing decision is thus especially difficult to reconcile with the purposes underlying the documents' inclusion in the record of the suppression proceedings.
 
 
 65
 Finally, one factor not crucial to our decision is nevertheless worth emphasizing: that is, that the lawfulness of the search and seizure was certain to be appealed at the time the trial judge entered his unsealing order.[111] That appeal has been filed and is still pending in this court. Until the appellate route has been exhausted, the lawfulness of the search and seizure has not been finally determined. The possibility of reversal on appeal contributes to the irony inherent in the decision to unseal the documents at issue.
 
 
 66
 Given all the factors discussed above we conclude that on the present state of the record the seal on the documents at issue here should not have been lifted, and should continue unless on remand some substantial factors are identified which weigh in favor of public access to particular documents.
 
 
 67
 B. Particularized Factors That May Have Weighed Against Nondisclosure
 
 
 68
 To facilitate the proceedings on remand, we set forth below several reasons based on the documents' contents which might have been thought by the trial judge to justify his unsealing order. On this record, of course, we cannot determine whether these reasons were relied upon; our discussion of them represents merely the observations of an appellate court, and no inference should be drawn from our discussion that would conclude our review of the reasons actually given by the trial judge when the matter is again before us.
 
 
 69
 One possible reason for unsealing is that the documents were already made public through other means; the government has made this claim, at least in this court, as to some of the documents.[112] A second is that the documents were stolen or contraband, hence forfeitable. The government asserted below that some of these documents meet that standard.[113]
 
 
 70
 A third possible reason, and the most troublesome as a matter of policy, is that the documents were evidence of crimes-whether additional evidence of the crimes charged, or evidence of other crimes committed by the defendants then before the court, or even evidence of crimes committed by persons not charged in the instant proceedings or then before the court. Of course, copies of the documents can be made available by the court to appropriate law enforcement authorities; no one disputes that here. But public access is more bothersome. Wholesale public access even of materials apparently relevant to criminal activity does not allow for the safeguards of the criminal process as to what is admissible evidence and what is not.[114] As to potential defendants not involved in the proceeding, or even as to evidence of other crimes of the same defendants, premature publication can taint future prosecutions to the detriment of both the government and the defense. If the additional evidence be merely cumulative evidence of the same criminal acts on which the disposition agreement was based, public access would seem to serve little purpose, except perhaps if and when the materials are relied upon in sentencing.[115]
 
 
 71
 It is, however, possible to conjure up exceptional cases. For example, there may be cases where massive scale crimes would go unpunished if documents were not released to permit the public to take the steps necessary to ensure prosecution. Release for this reason might be considered justifiable under circumstances where the integrity of the law enforcement process would be substantially served by permitting public access; for example, where a governmental failure to prosecute in the light of overwhelming probable cause substantially impugns the integrity of the prosecutorial function. Another circumstance where access might be thought warranted is where the remedies of grievously injured and unknowing victims would be jeopardized if the documents never entered the public domain. Whether the trial judge justified unsealing on these or other bases is unclear. We think it incumbent on him to identify the reasons for his action with respect to the particular documents at issue.
 
 
 72
 C. Particularized Privacy Interests Which May Weigh in Favor of Denying Public Access
 
 
 73
 To be weighed against the particularized reasons which may justify public access are the particularized privacy or other interests that the Church or the individual defendants may assert.[116] Some of these interests have already been weighed by the trial judge.
 
 
 74
 In his order of October 30, denying reconsideration of the earlier unsealing order, Judge Richey explained:
 
 
 75
 The defendants cite instances in which documents discuss the sex lives of members of the Church, tax returns of individuals, and attorney-client material of law firms. In order to make certain that such material, which would violate rights of innocent third-parties is not released, the Court will examine the documents at issue and will keep under seal those documents or portions of documents which would result in an unwarranted invasion of privacy. Of course such an exercise will be time consuming; however, fairness requires such a procedure.[117]
 
 
 76
 The kinds of interests cited by the defendants below do not, we think, exhaust the types of particularized privacy interests that might be asserted in the supplemental proceedings, nor do we think that the privacy interests to be protected are limited to those of "innocent third-parties." Valid privacy interests might be asserted either by the Church or by the individual defendants in documents as to which they (or Church members if the Church proceeds representatively) could assert a privilege against evidentiary use[118] or in documents which reveal the intimate details of individual lives, sexual or otherwise,[119] whether or not they concern "innocent third parties." Other valid privacy interests might also be asserted; we do not decide now which are valid and which are not.
 
 
 77
 IV. THE PROCEDURES TO BE FOLLOWED IN THE SUPPLEMENTAL PROCEEDINGS
 
 
 78
 We contemplate that on remand the district court will review its decision to unseal the documents. In doing so, the court should bear in mind: the Supreme Court's injunction that judicial officers attempt to minimize the intrusiveness of document searches;[120] and this court's determination, on the basis of the record now before us, that the seal on the documents at issue should be retained, absent substantial factors weighing in favor of public access.
 
 
 79
 The record does not permit us to determine how the trial judge's analysis of the generalized interests at stake differed from our own, nor whether he may have justified disclosure on the basis of the "particularized" factors we suggest or on some other basis. If, upon reconsideration in light of our analysis, the trial judge determines to abide by his unsealing order in whole or in part, the reasons relied upon should be identified in a supplemental rationale with specific reference to the particular documents or group of documents to which each reason is applicable.
 
 
 80
 This supplemental rationale should be supplied to the parties, including the Church. The defendants on their own behalf and the Church on behalf of itself and its constituent members may then, by motion for reconsideration and accompanying affidavit, contest the reasons given in the supplemental rationale and articulate any particularized privacy interest they wish to assert with respect to a document that is to be released. The district court may then grant or deny the motions in whole or in part. It may be that where both the public interest in access and the private interest in non-disclosure are strong, partial or redacted disclosure would satisfy both interests. Such portions of the supplemental rationale, responses thereto and any order on reconsideration that are revealing of the contents of the documents at issue should be filed under seal. The record of the supplemental proceedings should then be transmitted to this court where our consideration of the orders will continue.[121]
 
 V. CONCLUSION
 
 81
 We vacate the orders denying intervention and temporary injunctive relief, appealed in Nos. 79-2313 and 79-2324;[122] stay the unsealing orders appealed in No. 79-2312 and remand the record for the proceedings which we direct. This division of the court retains jurisdiction over the matter and orders all documents here at issue sealed pending our decision following remand.
 
 
 82
 So ordered.
 
 MacKINNON, Circuit Judge, dissenting:
 
 83
 To my mind the majority opinion confuses privacy with secrecy. The majority resolve this appeal by remanding the record for clarification by the district court of the grounds on which it removed the seal on documents introduced into evidence by the defendants at the suppression hearing. The majority accompanies its disposition with a stay forbidding further disclosure of the evidentiary documents until this panel, which retains jurisdiction over the appeal, issues a further order regarding them.
 
 
 84
 My dissent from this disposition is based on my conclusion that the disclosure was not only warranted, but required. I also find the record sufficiently detailed to support the action taken by the district court, making this remand unnecessary. Finally, I disagree with the court that the Church of Scientology of California[1] is entitled to intervene in the criminal proceedings.
 
 
 85
 * The facts are fully set forth in the court's opinion and, except for several which bear emphasis, will not be repeated here.
 
 
 86
 The source of the documents which are the subject of this appeal was the seizure from the Church of Scientology of California, at two Los Angeles locations. Copies of the 50,000 pages seized were transmitted to Washington, D. C. for consideration by the trial court to determine the validity of the search against the contention that it was a constitutionally impermissible general search. There is no disagreement on the court that the legal effect of requesting the trial court to examine the entirety of the seized materials was that they became part of the "record" of the case. Supra at 299 (quotation marks in original). I agree with the factual conclusion of the majority that this reflects the contemporaneous understanding of the parties and the district court.[2]
 
 
 87
 In the criminal proceedings involving individuals who are employees or officials of the Church of Scientology, the trial court adopted a disposition of the charges that conformed to the negotiated plea agreement. Just before rendering guilty verdicts after a bench trial, the judge ordered that all seized documents which the defendants had caused to be admitted into evidence on the earlier suppression motion, and which had not been earlier returned as unnecessary to the prosecution or used in the examination of witnesses at the suppression hearing, be made available for public inspection. Attempts to stay the disclosure were ineffective in the district court, before a motions division of this court, and before this Court en banc. Thereafter, the Chief Justice of the United States, acting as Circuit Justice, also denied an application for a stay. The disclosure of the documents was the question involved in such proceedings and the same issue is raised here a second time.
 
 II
 
 88
 This proceeding reaches the court in a posture where the public disclosure of all the documents has continued until the present date. The majority now orders that the documents be sealed to prevent public access. Further disclosure is prohibited pending review by this court after remand. I dissent from that disposition because there is an ample factual and legal basis for the order of the district court making such evidentiary documents available as court records in the case.
 
 
 89
 * At the outset it is essential to consider the posture of the case when the judge removed the seal from the documents. The original claim by the defendants was that the search was illegal. This claim was based upon the allegedly overbroad language of the search warrant. In this respect the search warrant in California was the same as the one in the District of Columbia which had been held to be valid. In Re Search Warrant Dated July 4, 1977, 572 F.2d 321 (D.C.Cir.1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). In Church of Scientology v. United States, 591 F.2d 533 (9th Cir. 1979), cert. denied 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 729 (1980) the court noted that "A similar warrant was obtained for a search of part of a building owned by the Founding Church of Scientology in Washington, D. C. The affidavits in support of the warrants were substantially identical, and so were the warrants, except for descriptions of the premises to be searched." (Emphasis added) 591 F.2d at 533. Nevertheless, the defendants in the criminal trial continued to press the claim by a motion to suppress. When the District Court in this Circuit, Judge Richey, ruled against the suppression motion all the evidence in the seized documents, in effect, became admissible as evidence against them. Apparently recognizing the probative force of such evidence to prove their guilt the defendants shortly thereafter entered guilty pleas as follows:
 
 
 90
 Sharon Thomas: Theft of government property-Count 17
 
 Gerald Bennett Wolfe: Conspiracy-Count 23
 Cindy Raymond: Conspiracy Count 23
 Mitchell Hermann: Conspiracy-Count 1
 Richard Weigand: Conspiracy-Count 23
 Gregory Willardson: Conspiracy Count 23
 Duke Snider: Conspiracy-Count 23
 Henning Heldt: Conspiracy-Count 23
 Mary Sue Hubbard: Conspiracy-Count 23
 
 91
 Thus, the ruling on the motion to suppress effectively caused the disposition of the case and under normal court procedures the record upon which the court ruled would become available to the public almost as a matter of course. A different situation would exist if the seized documents had not been introduced into evidence, but they had-all of them. The Church contends that the documents had been introduced under seal "for the purpose of showing that the search and seizure was unlawful." They were admitted by the court as being relevant for that purpose. But the court ruled that such documents did not prove the search to be unlawful. The documents thus are at the core of the court's decision denying the suppression motion and it is customary and ordinary in such cases for the record to disclose the evidentiary basis for the ruling. And there is nothing to the point, that since the court ruled the search was lawful, and the documents had been offered by the defendants to prove the search was unlawful, that the documents upon which the court ruled may not be disclosed.
 
 B
 
 92
 Additionally, there is nothing to the point that the Church has a different interest from the defendants. The individual defendants were not acting for themselves. They were acting for the Church. As charged in the indictment the Church of Scientology was organized with "a department known as the 'Guardian's Office' (which) had responsibility to promote the interests of Scientology by covertly identifying, locating, and obtaining all Scientology-related information in the possession of various individuals, government agencies and private organizations. Each of the Guardian Offices was composed of five bureaus including the Information Bureau which was assigned the responsibility for the conduct of covert operations including the collection of data and documents of interest to Scientology." (Emphasis added).
 
 
 93
 Individual defendants, including the wife of the head of the world wide Church, held official positions in the Guardian Office, United States, of the Church of Scientology as listed below in the column entitled "Positions".
 
 Approximate
 
 94
 Individuals Periods Positions
 
 
 
 Henning Heldt Nov. 21, 1973- Deputy Guardian US
 June 20, 1977 (DG US)
 Duke Snider March 1974- Deputy Guardian--
 Dec. 1, 974 Information US
 (DG I US)
 Dec. 1, 1974- Deputy-Deputy
 June 20, 1977 Guardian US
 (DDG I US)
 Richard Weigand Dec. 1, 1974- Deputy Guardian--
 May 15, 1977 Information US
 (DG I US)
 Gregory Willardson Sometime 1974- Information Bureau
 Jan. 1, 1976 Branch I Director US
 Jan. 1, 1976- Deputy-Deputy Guardian
 June 16, 1977 Information US
 (DDG I US)
 June 16, 1977- Deputy Guardian
 June 20, 1977 Information US
 (DG I US)
 Mitchell Hermann Jan. 1, 1974- Branch I Director,
 a/k/a Mike Cooper March 1, 1975 Guardian's Office, DC
 Jan. 1, 1976- Southeast US Secretary,
 March 1, 1977 Guardian's Office, US
 (SEUS SEC.)
 Cindy Raymond June 1, 1974- Information Bureau
 Jan. 1, 1976 Collections Officer US
 Jan. 1, 1976- Information Bureau
 Sept. 1, 1976 Branch I Director US
 Sept. 1, 1976- Information Bureau
 June 20, 1977 National Secretary US
 Gerald Bennett Nov. 18, 1974- Covert Operative
 Wolfe June 30, 1976 for Guardian Office
 in Internal Revenue
 Service
 Mary Sue Hubbard Nov. 21, 1973- Controller and
 May 27, 1977 Commodore Staff
 Guardian (CSG)
 supervising
 Guardian Office
 Sharon Thomas Feb. 29, 1976- Covert Operative
 Nov. 5, 1976 for Guardian
 Office in Department
 of JusticeThe offense alleged in the first count to which Hermann plead guilty was an unlawful conspiracy "to commit offenses against the United States of America, that is, by various illegal and unlawful means, to locate and obtain illegally information and documents in the possession of the United States of America which were related to Scientology and to individuals, organizations and agencies perceived to be enemies of Scientology."
 The conspiracy alleged in count 23 to which six (6) other officials of the Church of Scientology plead guilty had as its alleged objectives:
 (a) to obstruct justice in violation of Title 18, United States Code, Section 1503;
 (b) to obstruct a criminal investigation in violation of Title 18, United States Code, Section 1510;
 (c) to harbor and conceal a fugitive from arrest in violation of Title 18, United States Code, Section 1071;
 (d) to make false declarations in violation of Title 18, United States Code, Section 1623;
 Thus, most of the defendants were principal officers of the Church and it was their activities as official "Guardians of the Church that generated most of the documents in question. That is the nature of the charges against the defendants and their guilty pleas are sufficient substantiation of the basic charges as the court noted in its order of December 7, 1979: "Each of the five defendants has admitted his or her guilt in open court. Moreover, never has this Court been faced with such overwhelming evidence of guilt." (JA 243).
 Moreover, a corporation is responsible for the acts of its officers and agents committed within the scope of their authority. E. g., United States v. Sherpix, 512 F.2d 1361, 1367 n. 7 (D.C.Cir.1975) I would thus not find the Church to have any separate interest in the seized documents. In addition some of the documents were admittedly stolen. Actually both the Church's officers and the Church have the same intent concealment of the same improper activity.
 C
 Had not the trial judge ordered the release of the documents the complaint would have been loudly asserted that he had unconstitutionally restricted access to an essential basis for his decision in violation of the First Amendment. The important public interest in assuring the proper conduct of judicial proceedings would also have been compromised by retaining a sealed record in a case where the materials had been an integral part of a judicial determination on a motion to suppress. Absent unsealing the record, there would have been no means to determine the basis for the trial court's ruling denying the defendant's claim of unlawfulness. Absent unsealing of the record, vital public information which had been involved in a serious and important judicial proceeding would have been unavailable for public inspection. In short, the trial judge was placed in a position where either action he elected in regard to the sealed documents would have been criticized. In my view, the only proper action was to remove the seal on the documents the court found not to support the defendants' claim that the search was unlawful.
 D
 Judicial proceedings are not secret in our society. Indeed, the judiciary scrupulously requires that all participants in a judicial proceeding be given equal access to the court, and that, particularly in criminal cases, the proceedings be open to the public, with severely limited exceptions. Where, as in this case, the criminal proceedings had been effectively completed, and the trial was to the court, there was no danger of adverse publicity affecting the rights of the defendants which might militate against an open proceeding. See Gannett Co., Inc. v. Pasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). Moreover, the defendants' guilty pleas had resolved all doubt as to their criminal conduct as reflected in the documents.
 This leaves us with the question of the harm to the petitioning party, from whose premises the documents were seized, resulting from disclosure of the documents.[3] That, in turn, must necessarily be balanced against the harm to the important public policies favoring disclosure.
 The Church of Scientology of California asserts that the seizure of documents from church buildings in Los Angeles necessarily demonstrates a sufficient interest in the question of the validity of the search to entitle the Church to intervene in the pending criminal proceeding involving only individual defendants. That contention has some appearance of reasonableness, but it does not withstand scrutiny.
 Any assessment of the correctness of the trial court's action must acknowledge the fact that a number of the documents quite simply do not belong to the Church of Scientology of California in the first place. Indeed, certain of the documents belong to others and were obtained through illegal means. In addition to United States Government documents admittedly stolen from the Department of Justice (Count 17), an amicus curiae brief filed in this court on behalf of two Florida newspapers states that certain of the documents belong to it, and were stolen from its lawyers. The newspapers have waived all privacy rights in the materials. Brief for Amici Curiae Times Publishing Co., and Clearwater Newspapers, Inc. at 5. This waiver does not in itself resolve the issue involved in this appeal but it serves to identify some of the documents and to emphasize that the Church of Scientology wants secrecy not privacy. These two concepts are related only in the result they effectuate; their motivations are decidedly different.
 The court by ordering this remand, and reimposing a seal, is ordering secrecy, despite its recognition of the "country's tradition of access to records of a judicial proceeding." This issue is best resolved by reference to the decision in Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-98, 98 S.Ct. 1306, 1311, 55 L.Ed.2d 570 (1977) where the Supreme Court addressed the question of access to court records:
 "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. . . .
 "It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes.
 "It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."
 (footnotes omitted) (emphasis added).
 The Supreme Court has recently affirmed the public nature of criminal trials. In his opinion for the Court, in Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Chief Justice stated "a presumption of openness inheres in the very nature of a criminal trial under our system of justice." at 573, 100 S.Ct. at 2825. In Richmond Newspapers the Supreme Court held that the public has a First Amendment right to attend a criminal trial, except in extraordinary circumstances where a closed proceeding is necessary to assure the defendant a fair trial.
 Collectively, these decisions establish the clear and historically based presumption favoring public trials. The record of a trial is no less a part of the proceeding than the actual examination of witnesses. Where, as here, the controversy presented to the court was limited to a single major issue the validity of the search and where the defendants contended that their claim of invalidity was proven by all the documents they caused to be admitted into evidence, making the documents available in the public record becomes even more important. Absent such access, the public's opportunity to assess the validity of the courts ruling as applied to these criminal defendants would be virtually nonexistent. (1) The central issue in the suppression proceedings, and (2) the factual basis for the acceptance of the plea bargain agreement, would be obscured from the public and the press. The confidence of the public in the judicial process, and the constitutional right of access to criminal proceedings, requires upholding the action of the trial court in this case.
 The requirement for public disclosure of the evidentiary record in a court proceeding which results in a judicial ruling naturally flows from the constitutional requirement that the trial be public. Even though a motion to suppress may not be a "trial" there is no difference in the ultimate requirement that the record be public. A judicial proceeding cannot be said to be public if the public be denied access to the evidence admitted as relevant to the issues before the court. It is as important to public disclosure of judicial proceedings that the public be able to read written evidence in the record as it is that they be able to hear oral testimony.
 One objective of a public trial of universal benefit to the public and defendants is that it prevents justice from being administered covertly or based on "secret bias or partiality." Id., p. 569, 100 S.Ct. p. 2823. It also protects judges from being improperly charged with bias, corruption or misapplication of the law. Had the motion to suppress been granted there is no question that the evidentiary record would have been available to the public, and it is just as available when the motion is denied.
 The majority states that it cannot determine from the trial judge's orders what factors entered into the decision to unseal, or whether he had appropriately balanced the generalized interests. The record does not support such criticism. The trial judge made explicit reference to his reasoning at the time he ordered the unsealing. The Court's order of October 25, 1979 stated:
 (T)his Court firmly believes that there is a right in the public to know what occurs before the courts. In addition, there is a public interest in access to Court records. As Justice Brandeis once said, sunshine is the best disinfectant. (JA 171)Regardless of the references to the public right "to know" and sunshine being "the best disinfectant", the statement that "there is a public interest in access to Court records" is a correct statement and an adequate basis for decision. In fact, it could have been stated more forcibly as a "public right in access to Court records." Cf., Richmond Newspapers, supra. I would accordingly follow:
 the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct "although the lower court relied upon a wrong ground or gave a wrong reason." Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224.
 Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).
 Necessarily inherent in the unsealing by the court was its decision to review the documents and specifically exclude those which were highly personal. This was done. Following the extraction of such personal documents the remaining documents involved in the suppression decision were unsealed to place them in the public record. The assertion that the learned trial judge did not thoroughly review the documents in their entirety is unsupported by the record, and is a complete unjustifiable assumption since the court's order explicitly acknowledged the need to examine the record in its entirety despite the time intensive nature of the review.[4]
 III
 On remand of this case, the Church of Scientology of California will be allowed to participate as an intervenor. In my view such action is incorrect because it interferes with a pending criminal case, and because the Church's claim regarding the documents can be made in other proceedings.
 By definition, the parties to a criminal proceeding are the government and the defendants. By definition, the issues in a criminal proceeding are concerned with the guilt or innocence of the defendants. While other issues ancillary to that central question of criminal responsibility are often involved, it is essential that pending criminal cases not be inhibited by the resolution of issues remote from the main case, particularly those involving parties other than the government and the criminal defendants. E. g., In the Matter of An Application for a Search Warrant of Wiltron Associates, Ltd., 49 F.R.D. 170, 172 (S.D.N.Y.1970).
 The Church of Scientology is entitled to bring an action posited on the federal court's general supervisory power over federal law enforcement officials for a return of the property, or it may make application in the court where the criminal proceedings were pending. United States v. Wilson, 540 F.2d 1100, 1104 (D.C.Cir.1976). These provide sufficient alternatives so that intervention in a pending criminal case should not be allowed. The majority is creating an unfortunate precedent which will unnecessarily obstruct criminal trials and greatly increase the already difficult case load which federal district courts must process. Accordingly, I dissent from allowing the Church of Scientology of California to intervene in a pending criminal proceeding to litigate its asserted interest in the seized documents.
 IV
 This appeal will again be before this panel after the learned trial judge has, in accordance with the court's opinion, explicated any additional reasons he may have had for removing the seal, and performed whatever further documentary review is required. Because the appeal is resolveable as it is presented to us, I respectfully dissent from the remand ordered by the court. Because in my view the court acted properly in opening the record to the public, I dissent from the sealing of the evidentiary documents. And because the trial court correctly denied the Church of Scientology of California leave to intervene in a pending criminal proceeding to assert collateral issues I dissent from the court's disposition of the remand issue.
 MEMORANDUM
 Opinion After Remand
 In United States v. Hubbard, 650 F.2d 293 (D.C.Cir. 1980), this court ordered this case remanded to the district court for "review (of) its decision to unseal the documents" at issue in light of "this court's determination, on the basis of the record now before us, that the seal on the documents at issue should be retained, absent substantial factors weighing in favor of public access." Id., at 324. We left open to the district court the option of abiding by its original order in whole or in part. However, we mandated that this result be accompanied by an expanded record. Any decision ordering the unsealing of documents was to include an explanation in a "supplemental rationale" of "how the trial judge's analysis of the generalized interests at stake differed from our own, (and) whether he may have justified disclosure on the basis of the 'particularized' factors we suggest or on some other basis as well as with specific reference to the particular documents or groups of documents to which each reason is applicable." Id., at 324. This rationale was to be supplied to the parties, including the Church, to enable them to file a motion for reconsideration in which they might contest its findings or offer evidence of particularized privacy interests in the involved documents. We postponed our final ruling on the original appeal from the unsealing order until such time as the district court ruled on these motions and transmitted the record of the supplemental proceedings to this court. Id., at 324-325.
 On remand, the trial judge who had issued the original order unsealing the documents reaffirmed the original reasons given for his order in a supplemental memorandum opinion issued on October 15, 1980. United States v. Hubbard, Crim. No. 78-401 (D.D.C. Oct. 15, 1980). Although the trial judge wrote that he "perceives no particularized reason for the release of the documents, other than those stated in the unsealing order," see id., slip op. at 3, he both restated several general reasons for his decision to release the entire group of documents at issue, and presented apparently particularized justifications for the release of individual documents or groups of documents. See id., slip op. at 4. However, he failed to identify the documents or groups of documents to which these particularized justifications applied. See id. The record was then transmitted to this court.
 On October 30, 1980, the trial judge recused himself from participation in any further proceedings in this case.
 On November 5, the district judge assigned to the case after the first judge's recusal filed an order stating that because he had no "knowledge regarding the trial judge's determination that disclosure of the documents under seal was warranted, (he) is in no position to 'supplement' his rationale (.)" Church of Scientology v. United States, Civ. No. 79-2975, slip op. at 2 (D.D.C. Nov. 5, 1980). Stating further that "this court perceives no 'substantial factors' favoring disclosure," he concluded:
 Upon consideration of the generalized and particularized privacy interests in the instant case, this Court can only conclude that the documents in question must remain under seal "until the evidentiary utility of the seized documents is exhausted."
 Id.
 No motions for reconsideration nor appeals have been filed subsequent to the November 5th order of the district court. Both appellants and appellees have filed memoranda with this court responsive to the earlier supplemental opinion of the original trial judge, appellants urging that the documents continue to be kept under seal, and appellees urging that the supplemental record provides a sufficient rationale for their unsealing. We consequently decide the original appeal from the unsealing order on the basis of the original record as supplemented by the memoranda and order issued by the two district judges.
 Our original remand, designed to clarify the reasons for release, did not require the district court to state particularized justifications for the release of individual documents or categories of documents; our remand required instead that if such justifications in fact contributed to the decision to unseal, then the reasons be stated and the documents to which they are applicable be identified. In his supplemental opinion, the original trial judge, though disclaiming any additional reasons for release other than those set out in his original order, set out several particularized justifications without reference to identifiable documents or groups of documents. In the absence of any such identification, neither this court nor the parties concerned can meaningfully address the stated reasons for release. Thus, the purpose of the remand was not fulfilled. If he had not recused himself, we would therefore have been forced to remand this case again, stressing that while the district court is not required to conduct the review which may be necessary to identify the documents to which the trial judge's apparently particularized justification pertain, he should have the opportunity to do so.
 The subsequent memorandum and order of the second judge, however, indicates that he has decided not to conduct any such review, as he perceives no substantial factors, generalized or particularized, favoring disclosure. Instead, he has ordered that the documents remain under seal until their evidentiary value is exhausted.
 In light of this new determination, this court now enters a final judgment, in accordance with the rationale stated in our earlier opinion, reversing the original unsealing order from which the appeals were taken, and remanding the case to the district court for reentry of an order similar to the order of November 5 maintaining the documents under seal. Upon entry of such order our stay of the original unsealing order will be automatically vacated.
 MacKINNON, Circuit Judge (dissenting): I dissent from the order sealing the record in this case. My reasons are stated extensively in my dissent, supra at 325. In short, in my view, the decision was within the discretion allotted to the trial judge and conforms to that "presumption of openness (which) inheres in the very nature of a criminal trial under our system of justice." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The availability of the documents in question to public scrutiny is fully supported by the principle that the public should have access to the testimony and written evidence in the record upon which the court relied in making its decision. Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-98, 98 S.Ct. 1306, 1311-12, 55 L.Ed.2d 570 (1977).
 
 
 [1]
 United States v. Hubbard, Cr. No. 78-401 (D.D.C. Oct. 25, 1979). The consolidated appeals argued to this panel are from four orders of the district judge. The first was entered in response to a motion filed by the individual criminal defendants to seal the stipulated record on which the trial was to occur. The motion was denied and the judge took the occasion to order the unsealing of the documents at issue here. That order is cited above and offers the rationale quoted in the text. The defendants' motion for reconsideration was denied in a second order entered October 30, 1979, also appealed here. Although the motion for reconsideration was denied, the court in a memorandum order responded to several arguments for nondisclosure raised by the defendants and expressed an intention to screen the documents prior to release to ensure against "an unwarranted invasion of privacy" of "innocent third-parties." These two orders are appealed by the individual defendants, Docket No. 79-2312, and are reprinted in the joint appendix filed in that case at 171 and 223, respectively. (The joint appendix in No. 79-2312 is hereinafter referred to as Hubbard App.)
 The third and fourth orders are the subject of appeals by the Church of Scientology of California (the "Church"). The third order, entered October 31, 1979, denied the Church's motion to intervene in the criminal case to assert its interest in retaining the documents under seal; the order is appealed in No. 79-2313. The fourth order, rendered orally November 2, 1979, in a proceeding assigned to the same judge but docketed in the district court as a separate civil action, dismissed the Church's motion for return of property and application for an order temporarily restraining public access to the documents unsealed pending their return; the order is appealed in No. 79-2324. Transcript of Proceedings, Church of Scientology of Cal. v. United States, Civ. No. 79-2975 at 51-56. The order denying intervention and the transcript of the proceedings in open court at which the Church's motion for return of property and application for a temporary restraining order were denied are reprinted in the appendix filed by the Church in Nos. 79-2313 & 79-2324 as documents (Docs.) 9 and 11, respectively. (The Church's appendix in Nos. 79-2313 & 79-2324 is hereinafter referred to as Church App.)
 
 
 [2]
 We vacate the orders denying intervention and temporary injunctive relief because we treat the various means by which the Church sought to assert its interests in the district court as having commenced a proceeding within the trial court's ancillary jurisdiction. See text at notes 63-65, infra. As noted in the text, infra, at note 67, we do not reach the question whether a nonparty may ever intervene in a criminal case. For the reasons given infra, note 63, we affirm that portion of the order appealed in No. 79-2324 which may be read to deny on the merits immediate return of the seized documents
 
 
 [3]
 We choose to retain jurisdiction with the virtual certainty that a simple remand would result in a second appeal regardless of the trial judge's ultimate decision. Our purpose is twofold. First, we hope to obviate the proliferation of motions and collateral proceedings which has characterized the litigation of this and other issues related to these criminal proceedings, a profusion of paper which has sorely tried the patience of this court and the district court. Second, we seek to ensure that the documents remain under seal until the matter is again before this court. If upon reconsideration the district court determines not to release any documents or if the parties determine not to contest the district court's ultimate decision, the parties should so inform this court
 
 
 [4]
 There seems to be general agreement that the number of documents unsealed was approximately half the total seized, but exactly how many documents were seized and how many were unsealed is unclear. Brief for Appellants in No. 79-2312 at 10 (suggesting that 50,000 pages are still under seal); id. at 11 (suggesting that 50,000 pages were unsealed by order here appealed); Appellants' Emergency Application for En Banc Rehearing in Nos. 79-2312 & 79-2313 at 1 (filed Nov. 2, 1979) (judge's order unseals "roughly 50,000 pages"); Church's Petition for Writ of Mandamus, In re Church of Scientology of Cal., No. 79-2318 (D.C.Cir. filed Nov. 9, 1979) at 3 (total documents seized number approximately 48,000); Church of Scientology of Cal. v. United States, 591 F.2d 533 (9th Cir. 1979), cert. denied, 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 729 (1980) ("Church asserts that more than 20,000 documents were seized") (unclear whether figure represents California searches only or combined total of California and District of Columbia searches). It suffices for our purposes to say that the number of documents seized was very large
 
 
 [5]
 The motion was made in the district court for the Central District of California under Rule 41(e), Fed.R.Crim.P. That rule provides that:
 A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the ground that he is entitled to lawful possession of the property which was illegally seized. . . . If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial. If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress.
 The California district court's memorandum decision finally dismissing the motion was entered July 5, 1978. Church of Scientology of Cal. v. United States, No. CV-77-2565-MML (C.D.Cal. Jul. 5, 1978), Hubbard App. at 37.
 
 
 [6]
 For two months after the seizure the seized material remained in the exclusive custody of the government. On August 8, 1977 the California district court to whom the Church's Rule 41(e) motion had been assigned ordered the seized material "impounded" by the clerk of that court while an appeal was taken in the District of Columbia courts from a holding in the Church's favor concerning the lawfulness of a search executed the same day, and as part of the same investigation, on the premises of the Founding Church of Scientology in the District of Columbia. The District of Columbia district court decision, In re Search Warrant Dated July 4, 1977, Misc. No. 77-151 (D.D.C. Aug. 24, 1979), Church App. Doc. 12, held that a warrant "virtually identical" (Brief for Appellee in No. 79-2312 at 1, n.1; Brief for Appellee in Nos. 79-2313 & 79-2324 at 1 n.1) to the warrant underlying the California searches was facially unconstitutional. The California district judge, reasoning that "the principle of collateral estoppel precludes further litigation on the constitutionality of the warrant here at issue," United States v. Various Documents, No. CV-77-2565-MML, slip op. at 1 (C.D.Cal. Aug. 8, 1977), Hubbard App. at 1, entered an order requiring the return to the Church of the materials seized in California, id. at 2, Hubbard App. at 2, but stayed this order pending appeal from the District of Columbia district court decision and ordered the materials "impounded" in the interim. Id
 When a panel of this court reversed the finding of facial invalidity, In re Search Warrant Dated July 4, 1977, 572 F.2d 321 (D.C.Cir.1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978), the California district court reopened the Rule 41(e) proceedings and, rejecting several arguments made by the Church, ordered the previously impounded materials returned to the government, permitting limited governmental use of the materials but prohibiting their disclosure to the public. Church of Scientology of Cal. v. United States, No. CV-77-2565-MML (C.D.Cal. Apr. 4, 1978), Hubbard App. at 6, 30. Shortly thereafter the government voluntarily returned to the Church approximately half the documents seized in the California searches. (See note 17, infra.) (The documents selected by the government for return to the Church are sometimes hereinafter referred to as the "returned" documents.)
 Apparently because the parties wished to preserve an accurate record of the documents seized, either for appeal of the Rule 41(e) determination or for use in collateral proceedings, the government and the Church entered into a stipulation (the "surrender stipulation," Hubbard App. at 35), on the eve of the documents' partial return, providing for the surrender under seal to the district court clerk in California of one copy of the documents to be returned. There is some dispute about which documents were actually surrendered under this arrangement, but it appears that at some point the California district court clerk obtained custody over copies of both the "returned" and the "non-returned' documents. The dispute's importance derives from a subsequent stipulation and order (the "transfer stipulation," Hubbard App. at 88) transferring to the custody of the District of Columbia district court the documents held by the clerk of the California district court. The documents so transferred were "to remain sealed" except to "be viewed by Judge Richey . . . in the pre-trial suppression hearings." Id. The stipulation described the documents to be transferred and kept under seal as follows: "the documents seized pursuant to the two Los Angeles search warrants, which are the subject of the above-captioned case (the 41(e) motion), and which are currently kept sealed in the custody of the Clerk of this (the California) Court pursuant to the (surrender) stipulation . . . ." Id. In fact what was transferred from the district court comprised not only the returned documents but all documents seized. Transcript of Proceedings in United States v. Hubbard, Cr.No. 78-401 (D.D.C.) (Tr.) Aug. 17, 1979 at 15-16 (government making this assertion). Thus the question is posed whether all documents actually transferred were subject to the sealing stipulation and order.
 We find as a matter of law that the "surrender" and "transfer" stipulations governed only the terms of custody of the returned documents and that the stipulations did not, by themselves, oblige the District of Columbia district court to retain the non-returned documents under seal. Thus any de jure seal on these documents must arise out of the independent actions of the parties and of the district court in the District of Columbia, and the propriety of the court's unsealing order will be considered without regard to considerations of comity that may be appropriate where the order of a coordinate jurisdiction is involved. See generally Covell v. Heyman, 111 U.S. 176, 182, 4 S.Ct. 355, 358, 28 L.Ed. 390 (1884).
 Some two weeks after the surrender stipulation was entered, but months before the transfer stipulation, the California district court disposed of some remaining issues in the Rule 41(e) proceeding and removed the restrictions previously placed on the government's use of seized materials. Church of Scientology of Cal. v. United States, No. CV-77-2565-MML slip op. at 21 (Jul. 5, 1978), Hubbard App. at 37, 57. A stay of this order was sought and denied in the circuit court but in response to a separately filed (July 12, 1978) application, the circuit court entered an order prohibiting the government, "pending appeal," from publicly disclosing the documents. Church of Scientology of Cal. v. United States, No. 78-2434 (9th Cir. Oct. 30, 1978), Church App. Doc. 4. The order, which originally permitted the government only to present the seized materials to federal grand juries, was modified December 13, 1978 to permit use of the materials "at resulting criminal proceedings." Id. (Dec. 13, 1978), Hubbard App. at 66. On February 22, 1979, the Ninth Circuit dismissed the Church's appeal for want of jurisdiction. Church of Scientology of Cal. v. United States, 591 F.2d 533 (9th Cir. 1979), cert. denied, 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 729 (1980).
 The Church and the individual defendants here argue that because the Ninth Circuit's orders placed restrictions on the documents' use "pending appeal," the orders survived that court's dismissal for want of jurisdiction and continued at least until certiorari was denied. We disagree. We think that "pending appeal" meant pending appeal from the order already entered in the district court on the basis of which the circuit court's jurisdiction depended and did not include the filing of a petition for certiorari, even though a circuit court may stay the issuance of its mandate until a petition for certiorari is denied. See Fed.R.App.P. 41(b). Moreover, we read the orders to address the government's use of the documents and not the court's; the propriety of a court's unsealing order once the materials were properly received in a "resulting criminal proceeding" must thus be determined independently.
 Assuming those documents not required to be surrendered were in fact given over to the California district court clerk at about the time the "surrender stipulation" was entered, there would seem to be a period from June 20, 1978 or at least from July 5, 1978 (when the district court indicated its wish not to exercise further control over the documents) until July 20, 1979 when the non-returned documents may not technically have been under seal. But given the confusion surrounding the initial stipulation, their actual accessibility to the public is questionable. See Tr. Jul. 20, 1979 at 6015, 6018 (government apparently asserting that all documents were kept by clerk in separate safe under seal). The parties have presented nothing to show that the public was in fact permitted access to the documents held by the California district court.
 
 
 [7]
 Extradition proceedings had been initiated in Great Britain against the two other individuals accused who were not in this country. Those proceedings culminated with an unsuccessful appeal by the accused to the House of Lords and we take notice of the fact that they have now been brought before the district court on the indictment returned by the District of Columbia grand jury
 
 
 [8]
 We find determinative the following exchange, occurring during the course of the taking of testimony in connection with the suppression motion:
 MR. BANOUN (Assistant United States Attorney): . . . It was after the 41(e) proceeding was completed that the government and the petitioner voluntarily entered into a stipulation to keep a copy of all the documents under seal, in the custody of the clerk of this court.
 THE COURT: In the transfer to our court in Washington, there are no restrictions on that transfer, are there, except they are-
 MR. BANOUN: Sealed.
 MR. BOUDIN: They are sealed, and they are for your view.
 THE COURT: All right.
 MR. BANOUN: It is one set, one copy of all the documents seized.
 THE COURT: And that is the only place where you have, anybody has-
 MR. BANOUN: A complete copy. It is not the only place where anybody has it, because the defense-not the defense, but the surety has (a complete copy).
 Tr. Jul. 20, 1979 at 6012-14.
 
 
 [9]
 It appears that the returned documents were offered and accepted for review before actual copies of those documents were presented to the court. Tr. Jul. 18, 1979 at 5425-28:
 THE COURT: Can we have an understanding, Mr. Hirschkop-
 MR. HIRSCHKOP (counsel for the defendants Heldt and Snider): Yes.
 THE COURT:-between you and your co-counsel that those documents may be made a part of the official record of the evidence in these three suppression motions?
 MR. HIRSCHKOP: Under seal, yes, sir.
 THE COURT: Subject to the same caveat the Court received all the others.
 MR. HIRSCHKOP: Well, I am a little hesitant to give the Court 20,000 documents and then say or have the Court say, "Without consulting you or giving you a chance to be heard, I will open the whole thing up."
 I trust the Court's good faith, but the Court may not understand the point we have at the time the Court should or should not reach such an opinion.
 These are 20,000 personal documents from the persons seized. Again, it comes back to the problem. Shall we force them to surrender all their rights to privacy by opening everything up in a public record in order to protect their right to privacy? So I will make them available to the prosecution voluntarily.
 THE COURT: And part of the record in this case?
 MR. HIRSCHKOP: Yes.
 THE COURT: All right.
 MR. HIRSCHKOP: All right.
 THE COURT: Is there any other counsel who will object to that procedure on the defense side? If so, state it now. Otherwise, your right to object is forgiven and forever lost for naught. By your silence I-
 MS. HETHERTON (Assistant United States Attorney): Your Honor-
 THE COURT: Let me ask Mr. Banoun as chief counsel for the prosecution.
 MR. BANOUN: I'm not chief counsel.
 THE COURT: Well, I treat you as such, like I treat Mr. Hirschkop as chief counsel for the defense.
 THE COURT: Mr. Banoun, will you accept them as part of the record in this case?
 MR. BANOUN: We have no objection to having-
 THE COURT: All right.
 MR. BANOUN: Also the documents which we have kept as part of the court file as well.
 THE COURT: Any objection?
 MR. BANOUN: So that every-
 THE COURT: Any objection to that addition to the documentary evidence? I am going to be really popular with my clerk. You can see that now, can't you?
 THE CLERK: We have included all the documents seized at this point?
 THE COURT: That is correct.
 The general understanding appears to have been that the stipulated transfer would provide the trial court with a complete set of the seized documents.
 
 
 [10]
 One rationale offered contemporaneously by the district judge for his repeated caveat that he retained discretion to unseal the documents was as follows:
 (T)he Court is going to seal these documents now, with the caveat that they can be opened at the discretion of the Court. Why? Because the Court is going to have to make reference to them in making findings, there is no question about that, as to whether or not this seizure was proper.
 And the Court feels that while it has restricted the government at this particular stage they are entitled to know why I have done it. And the public also is entitled to know why I have done it.
 Also, since the six attacks on the warrant and the seizure and the search, broadly stated and specifically stated, are complex and raise difficult issues, and the Court has endeavored, to the best of its ability, to extend the defense every conceivable opportunity it concedes proper, to let them put on any and all evidence that will be of assistance to the Court as well as argue.
 But that does not mean that the government has had no rights, either. I am just suggesting that I think I understand the law about search and seizure pretty well, not that I cannot be educated further. All of us lawyers and judges have a lot to learn, and this judge is no exception.
 So with that let's proceed, Mr. Banoun.
 Tr. Jul. 19, 1979 at 5868-69 (emphasis supplied).
 
 
 [11]
 Fed.R.App.P. 10(a); United States v. Ross, 321 F.2d 61, 65 n.2 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963); Administrative Office of United States Courts, Manual for Clerks of United States District Courts §§ 201.1, 201.2(F)(1) (1978), ch. 13, Ex. 2 at 4-5 (1954) (classifying exhibits as "auxiliary case records"), cited in United States v. Mitchell, 551 F.2d 1252, 1259 & n.28 (D.C. Cir. 1976), rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Whether the documents were or were not technically "received" in evidence is quite beside the point. For example, documentary materials offered but excluded by a trial judge on evidentiary grounds can be part of the "record" at least for purposes of appeal of the evidentiary ruling. 9 Moore's Federal Practice P 210.04(3) at 10-18 (1980), citing Chicago & E. Ill. R.R. v. Southern Ry., 261 F.2d 394, 402 (7th Cir. 1958); Texas & Pac. Ry. v. Buckles, 232 F.2d 257, 261 (5th Cir.), cert. denied, 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498 (1956). Nevertheless, to state that materials are part of the record of the case does not answer the question whether they are or should be public. This question we address below. Depending on the circumstances, technical receipt in evidence may or may not weigh heavily in determining the answer to this question
 
 
 [12]
 See exchange quoted supra, note 9
 
 
 [13]
 The parties inform us that only 74 of the documents were used in the examination of witnesses at the suppression hearings. Reply Brief for Appellant in Nos. 79-2313 & 79-2324 at 3. The trial judge described only a handful in his memorandum opinion. United States v. Hubbard, 493 F.Supp. 209 at 231 (D.D.C.1979), Hubbard App. at 104, 145 (Red Box Data Information Sheet); Id. at 232, Hubbard App. at 146 (Government exhibit 111); Id. at 233, Hubbard App. at 148 ("Re: Herb")
 An issue is made by the government of the admission in evidence at the suppression hearing of "an inventory breakdown" and a "computer printout" which were prepared in conjunction with a study conducted on defendants' behalf of the seized materials. The "inventory breakdown" classified 23,000 seized documents as within or without the warrant and grouped them into several categories. The "computer printout," comprising nine volumes, was apparently the basis for the "inventory breakdown." It contained a separate entry for each of the documents studied and an indication of whether it was within or without the warrant. We have examined both the "inventory breakdown" and the "computer printout" and do not find them revealing of the content of the documents surveyed.
 
 
 [14]
 Judge Richey decided, inter alia, that overbreadth of the search would not by itself taint the entire seizure, United States v. Hubbard, 493 F.Supp. 209 at 221-224 (D.D.C.1979), Hubbard App. at 126-31, and that documents seized within the scope of the warrant, id., or in plain view, id. at 41, Hubbard App. at 144, during the course of the search need not be suppressed. He also determined, relying on his own view of the premises and the statements of witnesses present at the search, that the physical scope of the search was not unreasonable, id. at 31-36, Hubbard App. at 134-39, and that the government made reasonable efforts to limit the search. Id. at 36-44, Hubbard App. at 139-44. Finally, he found that none of the documents upon which the government intended to rely for its case-in-chief were outside the scope of the warrant. Id. 47-48, Hubbard App. at 150-51. Under this rationale examination of all the documents seized may not have been necessary and there is no indication in the memorandum opinion that such an examination was undertaken. However, when the unsealing order was challenged and counsel for one defendant suggested to the court:
 You are opening up now 12,000 to 15,000 documents that you have never read.
 You have read a handful of them; not even one-tenth, not even one-hundredth of one per cent of those documents;
 Judge Richey retorted:
 That is a gratuitous statement which you have made and which I am not going to accept, and I don't think it is proper for you to make, because you don't know what I have read.
 Tr. Oct. 26, 1979 at 56-57.
 
 
 [15]
 The defendants had moved for an order compelling the government specifically to perform a plea agreement. The court found that the government had in fact tendered a plea agreement, that the defendants had accepted the offer, and that the government would be bound by the offer made. United States v. Hubbard, Cr.No. 78-401 (D.D.C. Oct. 8, 1979), Hubbard App. at 157. The offer found by Judge Richey to have been made expressly contemplated appellate review of the convictions. Id. at 10, Hubbard App. at 166. As one defense counselor stated to Judge Richey on the day the verdicts were rendered, "the whole point of the plea agreement-the whole point of the plea agreement was to preserve for the defendants an appeal on the legality of the search and seizure." Tr. Oct. 28, 1979 at 8, Hubbard App. at 176. The trial judge's own understanding was the same. Id. at 21, Hubbard App. at 189. The agreement enforced expressly provided that the government could not make available either to the press or to private individuals copies of documents seized in California (apart from those contained in the stipulated record). United States v. Hubbard, Cr.No. 78-401, slip op. at 11 (D.D.C. Oct. 8, 1979), Hubbard App. at 167
 
 
 [16]
 Each of the nine defendants was found guilty of one count of the indictment. Seven were found guilty under Count XXIII, charging conspiracy to obstruct justice; one was found guilty under Count I, charging conspiracy illegally to obtain government documents; and one was found guilty under Count XVII, charging theft of government property. Although the point is made in text and notes below, text at notes 21-22 and notes 21 & 22, it is worth emphasizing that the documents at issue in this appeal do not include those documents made a part of the stipulated record on which these convictions were based
 
 
 [17]
 See United States v. Hubbard, 493 F.Supp. 209 at 233 (D.D.C.1979), Hubbard App. at 149 (government represented that returned documents "were deemed unnecessary"). Although the reasons for the documents' return are unclear, they may have been returned pursuant to Andresen v. Maryland, 427 U.S. 463, 482 n.11, 96 S.Ct. 2737, 2749 n.11, 49 L.Ed.2d 627 (1964) (approving the return of papers "not within the scope of the warrants or . . . otherwise improperly seized"). United States v. Hubbard, supra, at 233, Hubbard App. at 149 (noting "this procedure (return) was approved . . . in Andresen ")
 
 
 [18]
 The approximately 200 documents included in the stipulated record are apparently among those "unsealed." However, we do not understand the unsealing of these documents to be at issue in these appeals. See note 21, infra
 
 
 [19]
 Church's Motion to Intervene and to Vacate the Court's Order of October 26, 1979, or in the Alternative to Stay Said Order Pending the Determination of the Appeal Therefrom, United States v. Hubbard, Cr.No. 78-401 (D.D.C. filed Oct. 29, 1979) at 1, Church App. Doc. 7 (hereinafter cited as Church's Motion to Intervene). The transcript of proceedings of October 26, 1979, the day after the unsealing order was entered, reveals that counsel for one of the defendants orally attempted to assert the rights of the Church (which he had represented in some portion of the California 41(e) proceedings) in opposition to the unsealing order, seeking a stay of five to seven days to permit preparation of the appropriate written application. Tr. Oct. 26, 1979 at 43-54, Hubbard App. 211-222. The stay was not granted, the judge apparently reserving decision until a written application was filed. Id. at 54, Hubbard App. at 222. The written motion to intervene was not filed until October 29 and the 41(e) application until November 1, several days after the judgments of conviction were entered
 It appears that actual release of the documents was withheld until the order denying defendants' motion for reconsideration was entered (October 30). Reply Brief for Appellants in No. 79-2312 at 19-20.
 
 
 [20]
 Church's Motion for Return of Property and Church's Application for Temporary Restraining Order, Church of Scientology of Cal. v. United States, Civ.No. 79-2975 (D.D.C. filed Nov. 1, 1979), Church App. Doc. 10. The Church sought return of the originals and all copies held by the government or the court
 with the exception that one copy of any such documents lodged with the Clerk of the Court shall be maintained under seal by the Clerk of the Court for utilization in connection with any appellate proceedings, including petitions for certiorari, by appellants in the criminal case entitled United States v. Hubbard, et al. 78-401, and thereafter returned to petitioner.
 Church's Motion for Return of Property at 2.
 
 
 [21]
 The individual defendants do not challenge the unsealing order insofar as it relates to the documents made a part of the stipulated record. Public access to that group of documents does not appear to be contested by the Church, either. Argument by the Church in the district court was restricted to documents other than those made a part of the stipulated record, Church's Motion to Intervene at 3-4, Church App. Doc. 7; and although a "claim" concerning these documents is asserted by the Church in its reply brief in this court, Reply Brief for Appellants in Nos. 79-2313 & 79-2324 at 4, we do not think the unsealing of these documents is actually before us
 Concerning the use of documents at the suppression hearing, the Church and the individual defendants each acknowledged at oral argument in this court that their positions would have been much "weaker" or "different" if all the documents had been introduced at the suppression hearing in haec verba or if witnesses had been extensively examined concerning the documents or if the trial judge had engaged in a document-by-document analysis in his consideration of the suppression motion. As a practical matter, we take this acknowledgment to abandon claims to the propriety of unsealing at least that group of documents which were used individually in the examination of witnesses at the suppression hearing or in the trial judge's opinion.
 
 
 [22]
 References in this opinion to "the documents at issue" are meant to denote only those documents unsealed which were neither made a part of the stipulated record for purposes of trial nor individually used in the examination of witnesses at the hearing on the suppression motion nor specifically referred to in the district court's opinion on the defendant's motion to suppress
 
 
 [23]
 Cf. Afro-Am. Publishing Co. v. Jaffe, 366 F.2d 649, 654 (D.C.Cir.1966) (en banc)
 
 
 [24]
 United States v. Farrell, 606 F.2d 1341, 1347 (D.C.Cir.1979), quoting Warden v. Hayden, 387 U.S. 294, 307-308, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967)
 
 
 [25]
 United States v. Wilson, 540 F.2d 1100, 1103 (D.C.Cir.1976), quoted in United States v. Wright, 610 F.2d 930, 934 (D.C.Cir.1979)
 
 
 [26]
 Property lawfully seized may be retained pending exhaustion of its utility in criminal prosecutions. See United States v. Farrell, 606 F.2d at 1347. Property unlawfully seized must on motion be promptly returned, see, e. g., Bolt v. United States, 2 F.2d 922, 923-924 (D.C.Cir.1924), unless it be contraband or statutorily forfeit, in which event it need not be returned at all. United States v. Farrell, 606 F.2d at 1347
 
 
 [27]
 United States v. Wilson, 540 F.2d at 1103-1104. Accord, United States v. Wright, 610 F.2d at 935; United States v. Farrell, 606 F.2d at 1343, 1347; United States v. Palmer, 565 F.2d 1063, 1065 (9th Cir. 1977); United States v. LaFatch, 565 F.2d 81, 83 (6th Cir. 1977), cert. denied, 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978). Jurisdiction to return is not dependent upon whether the matter falls within the compass of Fed.R.Crim.P. 41(e). United States v. Farrell, 606 F.2d at 1347; United States v. Wilson, 540 F.2d at 1104
 
 
 [28]
 See Church's Motion for Return of Property, Church of Scientology of Cal. v. United States, Civ.No. 79-2975 (D.D.C. filed Nov. 1, 1979) at 2, Church App.Doc. 10
 
 
 [29]
 Church's Memorandum in Support of Application for Temporary Restraining Order, Church of Scientology of Cal. v. United States, Civ.No. 79-2975 (D.D.C. filed Nov. 1, 1979) at 2, Church App.Doc. 10
 
 
 [30]
 Id
 
 
 [31]
 Church's Motion to Intervene at 1, 4, 5, Church App.Doc. 7
 
 
 [32]
 As noted above, note 21, the Church did not contest the unsealing of the documents made a part of the stipulated record for purposes of trial
 
 
 [33]
 Church's Motion to Intervene, Church App.Doc. 7
 
 
 [34]
 Rakas v. Ill., 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). See Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967); id. at 361, 88 S.Ct. at 516 (Harlan, J., concurring)
 
 
 [35]
 See G.M. Leasing Corp. v. United States, 429 U.S. 338, 353-54, 97 S.Ct. 619, 628-29, 50 L.Ed.2d 530 (1977) (fourth amendment violated by warrantless search of company offices and seizure of books and records for purpose of facilitating satisfaction of tax liability of company's general manager); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920) (reversing judgment of contempt against company and individual for refusal to comply with subpoena requiring production of company books and documents whose existence was ascertained through unwarranted search of company office) ("(T)he rights of a corporation against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way.")
 
 
 [36]
 G.M. Leasing Corp. v. United States, 429 U.S. at 354, 97 S.Ct. at 629. Cf. CAB v. United Airlines, Inc., 542 F.2d 394, 397 (7th Cir. 1976) (administrative inspection of regulated carriers) (avoiding fourth amendment question by rejecting plenary inspection powers claimed by agency to have been authorized by statute), quoting Statement of Judge Leventhal as to Why He Would Grant Suggestion for Rehearing En Banc in Burlington N., Inc. v. ICC, 462 F.2d 280, 288 (D.C.Cir.), cert. denied, 409 U.S. 891, 93 S.Ct. 120, 34 L.Ed.2d 148 (1972):
 The items involved are internal papers that stand at the heart of management effort, and so long as our carrier operations are rooted in private enterprise there is a strong element of privacy in such items.
 
 
 [37]
 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749, 49 L.Ed.2d 627 (1975). The trial judge relied heavily upon Andresen in his decision on defendants' motion to suppress. United States v. Hubbard, 493 F.Supp. 209 (D.D.C.1979), Hubbard App. at 104
 
 
 [38]
 Whalen v. Roe, 429 U.S. 589, 598 n. 23, 97 S.Ct. 869, 876 n.23, 51 L.Ed.2d 64 (1977); Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). Cf. Griswold v. Conn., 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (multiple constitutional sources of protectible privacy interests)
 
 
 [39]
 The liberty interests protected by the fifth amendment have been read broadly. See Bolling v. Sharpe, 347 U.S. 497, 499-500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) (holding District of Columbia school segregation to violate fifth amendment's due process clause):
 Although the Court has not assumed to define "liberty" with any great precision, that term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective.
 But see Mazaleski v. Treusdell, 562 F.2d 701, 709-715 (D.C.Cir.1977) (Public Health Service commissioned officer's termination for "unsatisfactory performance" not infringement of liberty).
 
 
 [40]
 The public is, of course, entitled to be informed concerning the workings of its government. That cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private rights of individuals
 Watkins v. United States, 354 U.S. 178, 200, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1957) (footnote omitted), quoted in Doe v. McMillan, 412 U.S. 306, 330, 93 S.Ct. 2018, 2033, 36 L.Ed.2d 912 (1973) (concurring opinion) (Congress has no general authority, through publication of report concerning school system, to expose private lives); Tarlton v. Saxbe, 507 F.2d 1116, 1124 (D.C.Cir.1974) (FBI duty to maintain accurate criminal records) (recognizing constitutional and common law expressions of "value of individual privacy," which serves to "insulate individuals from unjustifiable government interference with their private lives").
 
 
 [41]
 Privacy Act of 1974, 5 U.S.C. § 552a(b) (1976) (prohibiting disclosure of personal information without consent except in certain circumstances); Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511(1)(c) (1976) (prohibiting all disclosure of information obtained by unauthorized wiretap). See Gelbard v. United States, 408 U.S. 41, 51-52, 92 S.Ct. 2357, 2362-63, 33 L.Ed.2d 179 (1972) (discussing Title III's prohibitions). See also 5 U.S.C. § 552(b)(6) (1976) (agency need not disclose under Freedom of Information Act, personnel, medical or similar files, whose disclosure would result in "clearly unwarranted invasion of personal privacy")
 
 
 [42]
 See United States Department of Justice, Compendium of State Laws Governing the Privacy and Security of Criminal Justice Information (1975); Note, Protecting Privacy From Government Invasion: Legislation at the Federal and State Levels, 8 Mem.St.L.Rev. 783 (1978)
 
 
 [43]
 See Katz v. United States, 389 U.S. 347, 350-51, 88 S.Ct. 507, 510-511, 19 L.Ed.2d 576 (1967) (comparing fourth amendment and state law protections of privacy); 2 Creighton L.Rev. 354 (1969) (analyzing lower court's decision in Nader v. Gen. Motors Corp., infra note 45, in which both federal constitutional and common law privacy interests were asserted)
 
 
 [44]
 See Time, Inc. v. Hill, 385 U.S. 374, 383 n.7, 87 S.Ct. 534, 539, 17 L.Ed.2d 456 (1967) (widespread recognition of right to privacy). It has been suggested that "the right of privacy should have a broader scope in the government disclosure area than in the private tort situation," Emerson, The Right of Privacy and Freedom of the Press, 14 Harv.C.R.-C.L.L.Rev. 334, 353 (1979)
 
 
 [45]
 See, e. g., Pearson v. Dodd, 410 F.2d 701, 704 (D.C.Cir.), cert. denied, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969); Afro-Am. Publishing Co. v. Jaffe, 366 F.2d at 653 (en banc); Bernstein v. Nat'l Broadcasting Co., 129 F.Supp. 817, 831 (D.D.C.1955), aff'd, 232 F.2d 369 (D.C.Cir.), cert. denied, 352 U.S. 945, 77 S.Ct. 267, 1 L.Ed.2d 239 (1956). See also Nader v. Gen. Motors Corp., 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970) (applying District of Columbia law)
 
 
 [46]
 An actionable right of privacy has been recognized by California courts for almost fifty years. See, e. g., Dietemann v. Time, Inc., 449 F.2d 245, 248 (9th Cir. 1971); Gill v. Curtis Publishing Co., 38 Cal.2d 273, 276-78, 239 P.2d 630, 632-33 (1952); Melvin v. Reid, 112 Cal.App. 285, 290-293, 297 P. 91, 93-94 (1931). Since 1972 privacy rights have been accorded express constitutional protection in California. In that year the state constitution was amended by referendum and now provides that among the "inalienable rights" enjoyed by the people is the right of "pursuing and obtaining . . . privacy." Cal.Const. art. I, § 1. According to a statement drafted by the amendment's proponents and circulated in a state brochure to prospective referendum voters, three of the principal "mischiefs" at which the amendment was aimed were as follows: "(1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose . . . ." White v. Davis, 13 Cal.3d 757, 775 & n.11, 120 Cal.Rptr. 94, 106 & n.11, 533 P.2d 222, 234 & n. 11 (1975). See Porten v. Univ. of San Francisco, 64 Cal.App.3d 825, 829-30, 134 Cal.Rptr. 839, 841-42 (1976); Note, The California Constitutional Right of Privacy and Exclusion of Evidence in Civil Proceedings, 6 Pepperdine L.Rev. 231 (1978) (arguing for the creation of an exclusionary rule in civil proceedings to protect the constitutional right of privacy). We have been unable to find a reported California decision where the privacy rights (constitutional or otherwise) of associations or corporations were determined. In Cobb v. Superior Court, 99 Cal.App.3d 543, 547 n.3, 160 Cal.Rptr. 561, 564 n.3 (1979), a California appellate court expressly reserved the question as to corporations
 
 
 [47]
 The suggestion can usually be traced to United States v. Morton Salt Co., 338 U.S. 632, 651-52, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950) whose rationale (see note 48, infra ) has not been as well remembered as its language. See, e. g., First Nat'l Bank v. Bellotti, 435 U.S. 765, 778 n.14, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978); Cal. Bankers Ass'n v. Schultz, 416 U.S. 21, 65-67, 94 S.Ct. 1494, 1519-20, 39 L.Ed.2d 812 (1974); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 184, 71 S.Ct. 624, 655, 95 L.Ed. 817 (1951) (concurring opinion). See also Liberty Lobby, Inc. v. Pearson, 390 F.2d 489, 492 (D.C.Cir.1967) (concurring opinion)
 
 
 [48]
 United States v. Morton Salt Co., 338 U.S. at 651-52, 70 S.Ct. at 368 (relying on public attributes of corporations to explain their lesser interest in privacy)
 
 
 [49]
 See, e. g., CAB v. United Airlines, 542 F.2d at 397-98; Colegio Puertoriqueno de Ninas, Liceo Ponceno, Inc. v. Pesquera de Busquets, 464 F.Supp. 761, 765 (D.P.R.1979); Socialist Workers Party v. Attorney Gen., 463 F.Supp. 515, 524-25 (S.D.N.Y.1978) (holding association itself has protectible privacy interests under New York law)
 
 
 [50]
 See Cal. Bankers Ass'n v. Schultz, 416 U.S. at 55, 94 S.Ct. at 1514 (organization may assert constitutional rights of its members); NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963) (because association directly engaged in activities claimed to be constitutionally protected, association though a corporation may assert on own behalf first amendment associational rights of members and lawyers); NAACP v. Ala. ex rel. Patterson, 357 U.S. 449, 458-59, 78 S.Ct. 1163, 1169-70, 2 L.Ed.2d 1488 (1958) (association may assert members' right of associational freedom). See generally Warth v. Seldin, 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975) (association may assert rights of others when seeking declaratory or injunctive relief); Comm. for Auto Responsibility v. Solomon, 603 F.2d 992, 998 n.13 (D.C.Cir.1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980) (listing conditions of "associational standing")
 
 
 [51]
 Cf. Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (church property dispute) (Court's prior decision "radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation"); construing Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872); Cantwell v. Conn., 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940) ("Even the exercise of religion may be at some slight inconvenience in order that the state may protect its citizens from injury.") (emphasis supplied)
 We agree with Judge Richey that the word "religion" is no talisman, see United States v. Hubbard, 493 F.Supp. 209 at 234, Cr.No. 78-401 (D.D.C.1979), Hubbard App. at 150, but in fact Judge Richey, for purposes of the suppression motion, assumed the Church was a bona fide religious organization, id. at 3, n.2, Hubbard App. at 106, and made no contrary finding for purposes of his unsealing order. See generally Founding Church of Scientology v. United States, 409 F.2d 1146, 1160-61 (D.C.Cir.), cert. denied, 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969) (prima facie case of Church's religious status made out on record of that case, where no government opposition).
 
 
 [52]
 Gavison, Privacy and the Limits of Law, 89 Yale L.J. 421, 457 (1980) ("The relative rarity of legal actions might be explained . . . in part because the initiation of legal action itself involves the additional loss of privacy."). See Emerson, The Right of Privacy and Freedom of the Press, 14 Harv.C.R.-C.L.L.Rev. 329, 348 (1979) ("The mere institution of litigation greatly accentuates the original loss of privacy; in fact, it normally multiplies the very effect from which relief is sought.")
 
 
 [53]
 By drawing upon decisions considering the right to return of seized property we do not mean to imply that the Church's procedural rights were dependent upon an immediate right to return of the documents at issue. See note 63, infra. We suggest only that a proprietary interest in a document, in combination with the privacy interests implicated by the facts and circumstances of the seizure, may give rise to a protectible interest in preventing indiscriminate public access to the records of which the document has become a part
 
 
 [54]
 See text at notes 78-89, infra
 
 
 [55]
 United States v. Wilson, 540 F.2d at 1103 (return of property); Morrow v. Dist. of Columbia, 417 F.2d 728, 740 (D.C.Cir.1969) (dissemination of information pertaining to accused's arrest)
 
 
 [56]
 See Go-Bart Importing Co. v. United States, 282 U.S. 344, 356, 51 S.Ct. 153, 157, 75 L.Ed. 374 (1931); Cogen v. United States, 278 U.S. 221, 225, 49 S.Ct. 118, 119, 73 L.Ed. 275 (1929); United States v. LaFatch, 565 F.2d at 82-83. Although this circuit's cases on return of property, see notes 24-27, supra, have all involved motions by defendants in the criminal proceedings rather than motions by third parties, none has turned on that circumstance, nor have we given it analytical significance. Ancillary jurisdiction enables " 'a common sense solution' of the problems courts . . . face in attempting to 'do complete justice in the premises,' " Morrow v. Dist. of Columbia, 417 F.2d at 738, quoting 1 W. Barron & A. Holtzoff, Federal Practice and Procedure § 23 at 94 (Wright ed. 1960)
 
 
 [57]
 Cent. S.C. Chapter v. Martin, 556 F.2d 706 (4th Cir. 1977), cert. denied, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978) and Cent. S.C. Chapter v. United States Dist. Court, 551 F.2d 559 (4th Cir. 1977) strikingly illustrate the procedural confusion that erupts when third parties claim some interest in the conduct of criminal proceedings. Those cases concerned a trial judge's restrictive order affecting the activities of the press during a criminal trial. The press' appeal from this order was dismissed because filed by a non-party. Id. at 563. Even treating the papers on appeal as a petition for writ of mandamus, the court concluded that relief was inappropriate under the accepted standards for issuance of the extraordinary writ, stating that it did not through this treatment reach the merits of the restrictive order. Id. at 562. Finally, treating the press' district court motion for stay as having commenced an independent action and the appeal as having been taken from denial of the stay, the appeal was dismissed because in that court's view a summary proceeding commenced by motion was inappropriate to the determination of the press' claims. Id. at 565. The court suggested that an independent action commenced by complaint might be an appropriate vehicle for the assertion of the kinds of interests raised by the press. When an independent action for declaratory and injunctive relief was filed and dismissed, however, the appellate court stated its belief that "mandamus is the proper remedy to request the relief prayed for," 556 F.2d at 707, treated the appeal on the merits as a petition for mandamus relief and modified the trial court's restrictive order. Id. at 708. Decisions in two other circuits have also identified mandamus as the appropriate vehicle for the assertion of third party interests in criminal proceedings. United States v. Sherman, 581 F.2d 1358, 1360-61 (9th Cir. 1978); CBS, Inc. v. Young, 522 F.2d 234, 237 (6th Cir. 1975). See also Martindell v. Int'l Tel. & Tel. Corp., 594 F.2d 291, 294 (2d Cir. 1979)
 A different conclusion was reached in the fifth circuit, however. In United States v. Gurney, 558 F.2d 1202 (5th Cir. 1977), cert. denied, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978), members of the press sought access to "documents and exhibits, some of which were in evidence (at the criminal trial) and some of which were only identified." Id. at 1205. When the clerk "refused access to many of these items pursuant to oral directions of the district judge," id., the press filed with the district judge a "Petition for Hearing and for Vacation of Restrictions on Press and Other News Media." Id. The trial judge considered the argument of the press and entered an order permitting inspection of those exhibits received in evidence, id., which was subsequently entertained by the circuit court on appeal, id. at 1206-07, a petition for writs of mandamus and prohibition having earlier been denied. Id. at 1206 n.4. Gurney is consistent with an approach applied in an earlier decision in that circuit, United States v. Briggs, 514 F.2d 794 (5th Cir. 1975). In that case the fifth circuit reviewed on appeal the denial of a pre-trial petition, submitted to the trial judge by unindicted co-conspirators, to expunge references to them from the indictment. The simple motion route has also been approved by the third circuit sitting en banc. United States v. Schiavo, 504 F.2d 1, 5 (3d Cir.) (en banc), cert. denied, 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974). In that case non-party newspapers had moved the trial judge to vacate a gag order he had entered in a criminal case; the trial judge's decision on that motion was reviewed on appeal. A proceeding by motion to the court of trial has occasionally even been denominated "intervention" without disapproval of the invocation of this concept in a criminal proceeding. See United States v. RMI Co., 599 F.2d 1183, 1186 (3d Cir. 1979) and cases discussed infra note 67.
 A case arising in our own circuit illustrates a third approach to the assertion of non-party interests in criminal proceedings. In United States v. Mitchell, 386 F.Supp. 639, 640 (D.D.C.1975) and 397 F.Supp. 186 (D.D.C.1975) members of the media seeking access to the "White House tapes" introduced in evidence and played at trial in the "Watergate case," brought a "motion" under Rule 47, Fed.R.Crim.P. Id., 386 F.Supp. at 640. Upon ruling that the media lacked standing to make a motion in the criminal case, Judge Sirica directed that the motion be treated as a miscellaneous civil proceeding. See United States v. Mitchell, 551 F.2d at 1256. Orders entered in that proceeding were appealed to this court where the appeal was entertained on the merits. Id. The Supreme Court granted certiorari and reviewing the merits of this court's decision, reversed. Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570. See also cases cited infra note 67.
 The means by which third parties have sought to assert their interests in state criminal proceedings have been equally various. Compare, e. g., Richmond Newspapers, Inc. v. Va., 448 U.S. 555, 558-563, 100 S.Ct. 2814, 2818-21, 65 L.Ed.2d 973 (1980) with State v. Simants, 194 Neb. 783, 236 N.W.2d 794 (1975), rev'd, Neb. Press Ass'n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). See also Gannett Co. v. DePasquale, 43 N.Y.2d 370, 401 N.Y.S.2d 756, 372 N.E.2d 544 (1977), aff'd, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) and cases cited infra, note 67. See generally Rendleman, Free Press-Fair Trial : Review of Silence Orders, 52 N.C.L.Rev. 127 (1973).
 
 
 [58]
 See note 57, supra
 Apart from the various methods employed by the Church itself, individual former and present Church members also brought a separate class action for injunctive relief, Doe v. Richey, Civ.No. 79-3274 (D.D.C. filed Dec. 5, 1979), alleging that members of the class were identifiably discussed in certain of the documents unsealed, that public access to these documents invades their privacy, infringes upon their rights of associational freedom and free exercise of religion, and that the circumstances surrounding the issuance of the unsealing order violated their due process rights. When all District of Columbia district court judges recused themselves, the action was assigned to a judge of this court, sitting as a district judge by designation.
 By memorandum opinion and order issued June 12, 1980, the complaint in that case was dismissed for lack of jurisdiction, id. (June 12, 1980), the court reasoning that the relief sought was in essence a writ of mandamus, id., slip op. at 2, which could not be employed to countermand an order of a court of coordinate jurisdiction. Id. In answer to the plaintiffs' argument that they were left without a remedy, the court suggested that mandamus relief in the court of appeals might be available, slip op. at 3-4, and noted that the propriety of intervention in a criminal case was still under consideration by this court in this case. Slip op. at 5. We think this action and its disposition serve as an additional illustration of the procedural confusion surrounding the assertion of third party interests in criminal proceedings. With respect to the availability of mandamus relief in the court of appeals our discussion infra, text at notes 60-62 and notes 60-62 is pertinent. But see note 121, infra.
 
 
 [59]
 Church's Petition for Writ of Mandamus, In re Church of Scientology of Cal., No. 79-2318 (D.C.Cir. filed Nov. 9, 1979) at 2
 
 
 [60]
 We have observed that while "(p)roperty which is seized in a criminal proceeding either by search warrant or subpoena may be ultimately disposed of by the court in that proceeding or in a subsequent civil action(,) (i)t makes for an economy of judicial effort to have the matter disposed of in the criminal proceeding by the judge that tried the case." United States v. Wilson, 540 F.2d at 1104. As this court noted in its general discussion of ancillary jurisdiction in criminal cases, "disputes related to a single dispute should be resolved in the original forum." Morrow v. Dist. of Columbia, 417 F.2d at 740
 
 
 [61]
 The ninth, fourth and sixth circuits have recently entertained on the merits petitions for mandamus relief brought by members of the press whose access was barred to various aspects of criminal proceedings to which they were not parties. United States v. Sherman, 581 F.2d at 1360-61; Cent. S.C. Chapter v. Martin, 556 F.2d at 707; CBS, Inc. v. Young, 522 F.2d at 237. See also Martindell v. Int'l Tel. & Tel. Corp., 594 F.2d at 294. See generally Ex parte Uppercu, 239 U.S. 435, 36 S.Ct. 140, 60 L.Ed. 368 (1915) (cited in Martindell ) (employing mandamus to permit individual not criminally charged to obtain sealed records of a criminal trial for use as evidence in civil proceeding). The special urgency with which the courts address restraints on the press, see In re Halkin, 598 F.2d 176, 199 (D.C.Cir.1979), may explain why in each of these cases the merits of the non-party's mandamus petition were fully considered and no attention was given to devising a means by which the interests at stake might first have been addressed to the district court judge
 
 
 [62]
 The availability of the extraordinary writ of mandamus is traditionally extremely limited. Kerr v. United States Dist. Court, 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725 (1976); Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 383, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953)
 Although the Supreme Court in Schlagenhauf v. Holder, 379 U.S. 104, 109-12, 85 S.Ct. 234, 237-39, 13 L.Ed.2d 152 (1964) and LaBuy v. Howes Leather Co., 352 U.S. 249, 257-60, 77 S.Ct. 309, 314-15, 1 L.Ed.2d 290 (1957) and this court in Colonial Times, Inc. v. Gasch, 509 F.2d 517, 524 (D.C.Cir.1975) have expressed a willingness to employ the writ in an advisory capacity to answer important questions of first impression and in a supervisory capacity to remedy certain classes of error not traditionally thought remediable by mandamus, this willingness cannot be read expansively. See Will v. United States, 389 U.S. 90, 99-107, 88 S.Ct. 269, 275-80, 19 L.Ed.2d 305 (1967); Nat'l Right to Work Legal Defense v. Richey, 510 F.2d 1239, 1242 (D.C.Cir.), cert. denied, 422 U.S. 1008, 95 S.Ct. 2631, 45 L.Ed.2d 671 (1975). But see In re Halkin, 598 F.2d at 199-200. To come to another conclusion would risk dilution of the extraordinary nature of the writ of mandamus and alteration of the proper functioning of trial and appellate jurisdiction. This is not to suggest that mandamus should not be available or continue to be available in extraordinary circumstances: to cure abuses of discretion; to answer novel and important questions of law; or, of course, to prevent the thwarting of appellate review. See Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). But see Helstoski v. Meanor, 442 U.S. 500, 505, 99 S.Ct. 2445, 2448, 61 L.Ed.2d 30 (1979) (mandamus unavailable when alternative remedies exist); Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (narrow availability of mandamus in criminal proceedings).
 Nevertheless, because of the writ's extraordinary nature, this court's earlier denial, without statement of reasons, of the Church's petition for mandamus, In re Church of Scientology of Cal., No. 79-2318 (D.C.Cir. Nov. 21, 1979), has no bearing on our decision of these appeals. See Hospes v. Burmite Div. of the Whittaker Corp., 420 F.Supp. 806, 809-10 (S.D.Miss.1976). See also Hoffman v. Blaski, 363 U.S. 335, 340 n.9, 80 S.Ct. 1084, 1088, 4 L.Ed.2d 1254 (1960).
 
 
 [63]
 The motion for return of property was dismissed
 as against the Clerk of the United States District Court for the District of Columbia on the ground that Rules 3 and 8(a) (Fed.R.Civ.P.) have not been complied with; and, furthermore, because there is no viable claim set forth in any of the papers, nor can the Court conceive that there could be, against the Clerk of this Court.
 Transcript of Proceedings, Church of Scientology v. United States, Civ. No. 79-2975, Nov. 2, 1979 at 56, Church App. Doc. 11. We do not understand the Church to appeal the district court's dismissal of the clerk as a party to its motion, but insofar as the Church contests that portion of the district court's order that may be read to deny on the merits immediate return of the seized documents, we affirm, because the evidentiary utility of the seized documents has not yet been exhausted. United States v. Wilson, 540 F.2d at 1103-04. First, at least copies of the documents may be needed for review of the defendants' criminal conviction. Second, the charges pending against the two other individuals remain to be prosecuted. We do not suggest that the government may, by selective prosecution or otherwise, prolong in bad faith its retention of seized material, but this case does not hint of such purpose.
 
 
 [64]
 See Cogen v. United States, 278 U.S. at 225, 49 S.Ct. at 119. Despite its criminal caption this motion, and the proceeding commenced by it, are civil in nature
 
 
 [65]
 Given this treatment, a statement now of the precise procedural mechanism the Church could have employed as an original matter is not strictly necessary. However, we offer our views for the guidance of the parties and the district court in future cases presenting similar facts. But see note 121, infra
 
 
 [66]
 See Go-Bart Importing Co. v. United States, 282 U.S. at 355, 51 S.Ct. at 157 (approving summary procedure for determination of claim to seized papers); Cogen v. United States, 278 U.S. at 225, 49 S.Ct. at 119 (same); Bolt v. United States, 2 F.2d at 923-24 (reversing denial of motion for return of property illegally seized); United States v. Wilson, 540 F.2d at 1103 (same) (summary nature of proceeding not addressed)
 "Summary" proceedings by definition are those conducted "in a prompt and simple manner." Black's Law Dictionary 1084 (5th ed. 1979). See N. H. Fire Ins. Co. v. Scanlon, 362 U.S. 404, 406-07, 80 S.Ct. 843, 845, 4 L.Ed.2d 826 (1960). For two reasons a full-scale evidentiary hearing might not in fact be permitted under a proceeding within the criminal trial court's ancillary jurisdiction. First, this court has concluded that a criminal trial court's ancillary jurisdiction is limited to circumstances where the claim is determinable without a substantial new fact-finding. Morrow v. Dist. of Columbia, 514 F.2d at 740. Second, under some circumstances the holding of an evidentiary hearing may threaten the kind of disruption of or delay in the progress of the criminal trial that the courts have consistently viewed with disapprobation. E. g., DiBella v. United States, 369 U.S. 121, 129, 82 S.Ct. 654, 659, 7 L.Ed.2d 614 (1962) (appeal unavailable from denial of pre-indictment motion to suppress); Cobbledick v. United States, 309 U.S. 323, 325-26, 60 S.Ct. 540, 541-42, 84 L.Ed. 783 (1940) (appeal unavailable from denial of motion to quash grand jury subpoena duces tecum ); Cogen v. United States, 278 U.S. at 228, 49 S.Ct. at 120-21 (appeal unavailable from denial of post-indictment motion to suppress).
 Although as a practical matter a proceeding within the trial court's ancillary jurisdiction may be the only truly effective means of protecting the kinds of interests here asserted, we think procedural due process does not require that these interests be explored in a full-scale evidentiary hearing. See N. H. Fire Ins. Co. v. Scanlon, 362 U.S. at 409-10, 80 S.Ct. at 847 ("It is true that courts have sometimes passed on ownership of property in their custody without a plenary proceeding, where, for illustration, such a proceeding was ancillary to a pending action or where property was held in the custody of court officers, subject to court orders and court discipline."), citing Go-Bart Importing Co. v. United States, 282 U.S. at 355, 51 S.Ct. at 157; Gannett Co. v. DePasquale, 43 N.Y.2d at 381, 401 N.Y.S.2d at 762-63, 372 N.E.2d at 550, aff'd, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (dictum) ("(C)ourts should of course afford interested members of the news media an opportunity to be heard, not in the context of a full evidentiary hearing, but in a preliminary proceeding adequate to determine the magnitude of any genuine public interest (in access to a suppression hearing).") See generally Parham v. J. L., 442 U.S. 584, 608 n.16, 99 S.Ct. 2493, 2507 n.16, 61 L.Ed.2d 101 (1979) (emphasizing flexibility of due process) ("(T)here is no requirement as to exactly what procedures to employ whenever a traditional judicial type hearing is mandated . . . ."); Cafeteria & Restaurant Workers Local 473 v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961) (similar); Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1282-87 (1975). But see United States v. Eisner, 533 F.2d 987, 994 (6th Cir.), cert. denied, 429 U.S. 919, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976) (dictum) (better to hold evidentiary hearing before entering exclusionary order in criminal case); United States ex rel. Lloyd v. Vincent, 520 F.2d 1272, 1275 (2d Cir.), cert. denied, 423 U.S. 937, 96 S.Ct. 296, 46 L.Ed.2d 269 (1975) (dictum) (same); Note, All Courts Shall Be Open: The Public's Right to View Judicial Proceedings and Records, 52 Temp.L.Q. 311, 332 (1979) (arguing for brief evidentiary hearing before exclusionary order is entered in criminal case, recognizing expense and delay to be caused).
 
 
 [67]
 Federal courts have frequently permitted third parties to assert their interests in preventing disclosure of material sought in criminal proceedings or in preventing further access to materials already so disclosed. See, e. g., United States v. Nixon, 418 U.S. 683, 692, 94 S.Ct. 3090, 3099, 41 L.Ed.2d 1039 (1974) (President, a nondefendant, may appeal denial of motion to quash post-indictment subpoena duces tecum directed to him, compelling production of records of certain presidential meetings); Gravel v. United States, 408 U.S. 606, 608 n.1, 92 S.Ct. 2614, 2619, n.1, 33 L.Ed.2d 583 (1972) (noting that district court had permitted Senator to intervene in proceeding on legislative assistant's motion to quash grand jury subpoena and that circuit court had permitted Senator to appeal from denial of motion to quash); Perlman v. United States, 247 U.S. 7, 12, 38 S.Ct. 417, 419, 62 L.Ed. 950 (1918) (owner may intervene to assert property and constitutional interests in preventing release to government, for purposes of grand jury investigation, of exhibits introduced and impounded in civil case); In re Grand Jury Applicants, 619 F.2d 1022 (3d Cir. 1980) (employer may appeal denial of motion brought as intervenor to quash grand jury subpoenas ad testificandum served on employees); United States v. RMI Co., 599 F.2d at 1186-87 (corporation may appeal denial of motion for protective order brought as de facto intervenor to prevent pre-trial disclosure to defendants of corporate books and records previously disclosed by subpoena to grand jury which indicted defendants). See also In re 1975-2 Grand Jury Investigation, 566 F.2d 1293, 1294-95, 1296 & n.6, 1301 (5th Cir.), cert. denied, 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978) (dismissing as nonappealable district court's order permitting party with no apparent ownership interest in documents to intervene in proceedings begun with purpose to disclose to another district court documents used in terminated grand jury investigation); Ill. v. Sarbaugh, 552 F.2d 768, 772-73 (7th Cir.), cert. denied, 434 U.S. 889, 98 S.Ct. 262, 54 L.Ed.2d 174 (1977) (permitting defendants in terminated criminal proceeding to intervene in motion brought by state for disclosure to it of grand jury transcripts). These assertions of interest have sometimes been denominated "intervention," Perlman v. United States, supra; Ill. v. Sarbaugh, supra; see In re Grand Jury Applicants, supra, United States v. RMI Co., supra, and the intervention criteria of the Federal Rules of Civil Procedure have occasionally been applied. Ill. v. Sarbaugh, supra. See In re 1975-2 Grand Jury Investigation, supra
 Both the language and rationale of United States v. RMI Co., supra, suggests that under the circumstances of this case the Church should be permitted to intervene to assert its interests in denying public access to the documents at issue. In that case the third circuit concluded:
 (I)t is settled law that persons affected by the disclosure of allegedly privileged materials may intervene in pending criminal proceedings and seek protective orders, and if protection is denied, seek immediate appellate review.
 Id., 599 F.2d at 1186. That civil intervention rights were historically absolute for those who had an interest in the property held in the custody or subject to the control or disposition of the court, 3B Moore Federal Practice P 24.09(1) (1980), is also suggestive of this conclusion. However, whether, when and for what purposes intervention eo nomine is or should be permitted in criminal proceedings is still a matter of some doubt. Cent. S. C. Chapter v. United States Dist. Court, 551 F.2d at 563-65 (dismissing appeal of order restricting activities of press during conduct of criminal trial) ("nothing in the criminal law or rules permit(§ press) to intervene"). See Gannett Pac. Corp. v. Richardson, 59 Haw. 224, 235, 580 P.2d 49, 57-58 (1978) (press may not intervene to protest closure of portion of preliminary hearing in criminal case); State v. Simants, 194 Neb. at 788, 236 N.W.2d at 798, rev'd on other grounds sub nom., Neb. Press Ass'n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (error to have permitted press to intervene to protest pre-trial gag order); State v. Ervin, 38 N.C.App. 261, 248 S.E.2d 91 (1978) (no error to have permitted post-trial intervention by non-party asserting interest in seized property); State v. Bianchi, 92 Wash.2d 91, 593 P.2d 1330 (1979) (error to have permitted non-party to intervene to protest gag order).
 
 
 [68]
 The Church's position on the merits of the unsealing order was argued to the trial judge in open court immediately after the decision was announced, Tr. Oct. 26, 1979 at 43-45, Hubbard App. at 211-13, and again in its motion to intervene, supra, note 19 (which was filed while Judge Richey informally stayed his unsealing order), and finally in its motion for return of property, supra, note 20, and in oral argument on that motion. Transcript of Proceedings, Church of Scientology of Cal. v. United States, Civ.No. 79-2975, Nov. 2, 1979 at 4-19, 29-42
 
 
 [69]
 The Church's motion to intervene was denied without a statement of reasons. United States v. Hubbard, Cr. No. 78-401 (D.D.C. Nov. 1, 1979), Church App. Doc. 9. Denial of the Church's application for an order temporarily restraining public access pending return of the documents was accompanied by the following rationale:
 (This) issue has been examined repeatedly by this court. It was the subject of an extensive opinion, carefully worded, carefully thought out, by this court in its order and memorandum of October 30, 1979.
 The very essence of the order of this court of October 30th held that a party does not have the right to hide material seized during a search on the ground that a search may be declared invalid on appeal.
 Since May 19, 1971, this court has kept statistics, and it has had the unfortunate duty to sentence more people convicted of crimes than any other judge of this court.
 And this case, namely, the case of the United States versus Hubbard, is the only case where documents in a suppression hearing, or otherwise, involving criminal charges have not been spread upon the public record.
 The public does have a right to know; and to hold otherwise would be to make a folly of the first amendment with respect to the right of the public to know, which this court has written on at length on several occasions.
 . . . The court finds that the relief sought here is no more than that relief which was denied by the court of appeals yesterday afternoon.
 It is essentially a recasting of an application for another stay of this court's October 30th order.
 And the court agrees with the government that what it really seeks here, namely, the petitioner, even though the other relief was sought by other parties, is to have this court reverse itself in its October 30, 1979 order, which it carefully considered, as previously indicated, and did not do.
 The court further finds that there is no likelihood of success on the merits, and that the public interest will be served by continuing to make the documents available to interested parties after examination by the court in accordance with the procedures that it has been following, and will continue to follow.
 Transcript of Proceedings, Church of Scientology of Cal. v. United States, Civ.No. 79-2975, Nov. 2, 1979 at 54-56, Church App. Doc. 11.
 
 
 [70]
 See notes 55-56, supra, and accompanying text
 
 
 [71]
 Cf. Cogen v. United States, 278 U.S. at 227-28, 49 S.Ct. at 120-21 (denial of defendant's pre-trial motion for suppression and return of seized property not "final")
 
 
 [72]
 Supplemental Memorandum in Support of Defendants' Motion for Reconsideration Re the Sealing of Documents, United States v. Hubbard, Cr.No. 78-401 (D.D.C. filed Oct. 29, 1979) (submitted by defendants Heldt and Snider); Motion for Reconsideration of Part of the Court's Order of October 25, 1979, United States v. Hubbard, Cr.No. 78-401 (D.D.C. filed Oct. 26, 1979) (submitted by all defendants). The last of these claims (privacy of individuals) appears to have been made only by defendants Heldt and Snider. Defendants' Supplemental Memorandum, supra at 2
 
 
 [73]
 See Go-Bart Importing Co. v. United States, 282 U.S. at 356, 51 S.Ct. at 157. The government challenges the appealability of the order denying the motion labeled by the Church as one for a temporary restraining order. Refusal of an order truly of that character is a ruling neither final under 28 U.S.C. § 1291 (1976) nor appealable though interlocutory under 28 U.S.C. § 1292(a)(1) (1976). Hoh v. Pepsico, Inc., 491 F.2d 556, 560 (2d Cir. 1974). See also Adams v. Vance, 570 F.2d 950, 953 (D.C.Cir.1977) (grant of temporary restraining order not ordinarily appealable). The denial is, however, appealable when it is equatable to denial of a preliminary injunction. Levesque v. Me., 587 F.2d 78, 79-80 (1st Cir. 1978). That treatment is proper here because the denial came only after the Church was heard on the merits. Sampson v. Murray, 415 U.S. 61, 86-88, 94 S.Ct. 937, 951-52, 39 L.Ed.2d 166 (1974). Moreover, the Supreme Court "has adopted essentially practical tests for identifying those judgments which are, and those which are not, to be considered 'final,' " Brown Shoe Co. v. United States, 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510 (1962) (citing cases), and an order may be deemed final and hence appealable when to do otherwise would effectively destroy the opportunity for meaningful review. N. D. State Bd. of Pharmacy v. Snyder's Drug Stores, Inc., 414 U.S. 156, 162, 94 S.Ct. 407, 412, 38 L.Ed.2d 379 (1973). See also Berrigan v. Sigler, 475 F.2d 918, 919 (D.C.Cir.1973), citing McSurley v. McClellan, 426 F.2d 664, 668 (D.C.Cir.1970). Here there is serious threat of irreparable harm to the property and the privacy interests advanced
 
 
 [74]
 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). On several occasions the collateral order doctrine has been applied by the Court to determine the reviewability of issues raised in criminal cases. See United States v. MacDonald, 435 U.S. 850, 853-61, 98 S.Ct. 1547, 1549-53, 56 L.Ed.2d 18 (1978) (holding unreviewable denial of defendant's motion to dismiss indictment on speedy trial grounds); Abney v. United States, 431 U.S. 651, 657-60, 97 S.Ct. 2034, 2039-40, 52 L.Ed.2d 651 (1977) (holding reviewable denial of defendant's motion to dismiss indictment on double jeopardy grounds). See also Helstoski v. Meanor, 442 U.S. at 506-08, 99 S.Ct. at 2448-49 (appeal was available for denial of defendant's motion to dismiss indictment on speech or debate clause grounds); Stack v. Boyle, 342 U.S. 1, 6, 72 S.Ct. 1, 4, 96 L.Ed. 3 (1951) (appeal was available for denial of defendant's motion to reduce bail). Significantly, the doctrine was applied by this court in In re Grand Jury Investigation of Ocean Transp., 604 F.2d 672, 673-74 (D.C.Cir., cert. denied, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979) (per curiam) to hold reviewable the district court's denial of a motion to return allegedly privileged documents inadvertently disclosed to the Department of Justice in the course of responding to a grand jury subpoena duces tecum. See also United States v. Cianfrani, 573 F.2d 835, 845 (3d Cir. 1978) (closure of pretrial hearing); United States v. Schiavo, 504 F.2d at 4-5 (gag order)
 
 
 [75]
 Cohen v. Beneficial Indus. Loan Corp., 337 U.S. at 546, 69 S.Ct. at 1225
 
 
 [76]
 Id. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 468-69, 98 S.Ct. 2454, 2457-58, 57 L.Ed.2d 351 (1978); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 171-72, 94 S.Ct. 2140, 2149-50, 40 L.Ed.2d 732 (1974)
 
 
 [77]
 Cobbledick v. United States, 309 U.S. at 327, 60 S.Ct. at 542. See United States v. MacDonald, 435 U.S. at 853-54, 98 S.Ct. at 1549-50
 
 
 [78]
 Nixon v. Warner Communications, Inc., 435 U.S. at 597, 98 S.Ct. at 1311 (hereinafter cited as Nixon ):
 It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. In contrast to the English practice, see, e. g., Browne v. Cumming, 10 B. & C. 70, 109 Eng.Rep. 377 (K.B.1829), American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit.
 (footnotes omitted); United States v. Mitchell, 551 F.2d at 1257-59 (hereinafter cited as Mitchell ), rev'd on other grounds sub nom. Nixon, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570. Cf. Richmond Newspapers, Inc. v. Va., 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).
 
 
 [79]
 See Nixon, 435 U.S. at 597-98, 98 S.Ct. at 1312:
 The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, and in a newspaper publisher's intention to publish information concerning the operation of government.
 (citations omitted); Mitchell, 551 F.2d at 1258:
 This common law right is not some arcane relic of ancient English law. To the contrary, the right is fundamental to a democratic state. As James Madison warned, "A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy: or perhaps both. . . . A people who mean to be their own Governors, must arm themselves with the power which knowledge gives." Like the First Amendment, then, the right of inspection serves to produce "an informed and enlightened public opinion." Like the public trial guarantee of the Sixth Amendment, the right serves to "safeguard against any attempt to employ our courts as instruments of persecution," to promote the search for truth, and to assure "confidence in . . . judicial remedies."
 (footnotes omitted). Cf. Richmond Newspapers, Inc. v. Va., 448 U.S. at 569-571, 100 S.Ct. at 2823-24 (multiple purposes of public access to conduct of criminal trial); Id. at 592-598, 100 S.Ct. at 2836-2839 (Brennan, J., concurring) (same); In re Oliver, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948) (public criminal trial is "restraint on possible abuse of judicial power"); United States v. Cianfrani, 573 F.2d at 851-54 (public right of access to criminal trials to see that justice is done); United States v. Lopez, 328 F.Supp. 1077, 1087 (E.D.N.Y.1971) (same).
 
 
 [80]
 435 U.S. at 598, 98 S.Ct. at 1312
 
 
 [81]
 See Stamicarbon, N.V. v. Am. Cyanamid Co., 506 F.2d 532, 539-40 (2d Cir. 1974) (access to criminal contempt trial may be restricted, over corporate defendant's objections, during portion of trial when another's trade secrets are disclosed); Note, All Courts Shall Be Open: The Public's Right to View Judicial Proceedings and Records, 52 Temp.L.Q. at 335 & n.214, citing, inter alia, State ex rel. Ampco Metal, Inc. v. O'Neill, 273 Wis. 530, 539-40, 78 N.W.2d 921, 927 (1956) (inherent power to hold proceedings in camera when trade secrets might be revealed); Annot. 62 ALR 2d 509, 510-29 (1958). See also Richmond Newspapers, Inc. v. Va., 448 U.S. at 600 n.5, 100 S.Ct. at 2821 (Stewart, J. concurring)
 
 
 [82]
 E. g., United States ex rel. Latimore v. Sielaff, 561 F.2d 691, 693 (7th Cir. 1977), cert. denied, 434 U.S. 1076, 98 S.Ct. 1266, 55 L.Ed.2d 782 (1978) (excluding the merely curious from the testimony of a rape victim); Harris v. Stephens, 361 F.2d 888, 891 (8th Cir. 1966), cert. denied, 386 U.S. 964, 87 S.Ct. 1040, 18 L.Ed.2d 113 (1967) ("frequent and accepted practice" to close courtroom to spectators during testimony of rape victim); Sawyer v. Duffy, 60 F.Supp. 852, 853 (N.D.Cal.1945). See also Richmond Newspapers, Inc. v. Va., 448 U.S. at 600 n.5, 100 S.Ct. at 2821 (Stewart, J. concurring). But see Lexington Herald Leader Co. v. Tackett, Nos. 80-SC-215-MR & 80-SC-287-MR, slip op. at 2, 4 (Ky. June 24, 1980) (although defendant did not object, closure of courtroom during testimony of ten children alleged to have been victims of sodomy was error)
 
 
 [83]
 See, e. g., United States v. Wash. Post, 403 U.S. 943, 91 S.Ct. 2271, 29 L.Ed.2d 853 (1971) (court permitting filing under seal of materials claimed to affect national security); N.Y. Times v. United States, 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 853 (1971) (same). See also Richmond Newspapers, Inc. v. Va., 448 U.S. at 598 n.24, 100 S.Ct. at 2839 (Brennan, J. concurring), citing United States v. Nixon, 418 U.S. at 714-16, 94 S.Ct. at 3110-11; United States v. Lemonakis, 485 F.2d 941, 962-63 (D.C.Cir.1973), cert. denied, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974)
 
 
 [84]
 See Branzburg v. Hayes, 408 U.S. 665, 684-85, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972); United States v. Gurney, 558 F.2d at 1209-10. See also Gannett Co. v. DePasquale, 443 U.S. at 378-79, 99 S.Ct. at 2904-2905. In addition, affidavits submitted in support of search warrants are sometimes sealed to protect the secrecy of an ongoing criminal investigation. See In re Sealed Affidavits, 600 F.2d 1256 (9th Cir. 1979); Shea v. Gabriel, 520 F.2d 879, 880, 882 (1st Cir. 1975)
 
 
 [85]
 See, e. g., Doe v. Webster, 606 F.2d 1226, 1233 (D.C.Cir.1979) (Federal Youth Corrections Act permits expungement of "conviction records"); Tarlton v. Saxbe, 507 F.2d 1116 (apparently addressing only records maintained by law enforcement agencies). Stephens v. Van Arsdale, 221 Kan. 676, 608 P.2d 972 (1980) (statutory denial of access to criminal court records not unconstitutional where convictions are ordered "expunged"). But see Johnson v. State, 336 So.2d 93 (Fla.1976) (expungement statute invalid insofar as it required judiciary to destroy court records)
 
 
 [86]
 Compare Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), distinguished in Chief Justice Burger's opinion in Richmond Newspapers as having considered only the question of closure of pretrial hearings, Richmond Newspapers, 448 U.S. at 561-564, 100 S.Ct. at 2820-21. See also the concurring opinion of Mr. Justice Stewart, id., slip op. at 1
 
 
 [87]
 Richmond Newspapers itself did not forbid all closure of criminal trial proceedings. As the Chief Justice noted, "We have no occasion here to define the circumstances in which all or parts of a criminal trial may be closed to the public." Id. at 581 n.18, 100 S.Ct. at 2830 n.18. See also id. at 584, 100 S.Ct. at 2831. (Stevens, J. concurring) (emphasizing "total absence of any record justification for th(is) closure order); id. at 598 n.24, 100 S.Ct. at 2839 n.24 (Brennan, J. concurring) (right to gather information must "be assayed by considering the information sought and the opposing interests invaded" and noting that "national security concerns . . . may sometimes warrant closures"); id., at 600 n.5, 100 S.Ct. at 2840 (Stewart, J. concurring) (suggesting justifiability of partial civil trial closure to preserve trade secrets and of partial criminal trial closure if sixth amendment rights were not impaired during portions of rape testimony)
 
 
 [88]
 Nixon, 435 U.S. at 598, 98 S.Ct. at 1312; See Richmond Newspapers, 448 U.S. at 581 n.18, 100 S.Ct. at 2836
 
 
 [89]
 Nixon, 435 U.S. at 599, 98 S.Ct. at 1312. This discretion should, of course, clearly be informed by this country's strong tradition of access to judicial proceedings a tradition which is now grounded, at least with respect to the actual conduct of criminal trials, in the first amendment
 
 
 [90]
 Richmond Newspapers, Inc. v. Va., 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973
 
 
 [91]
 Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)
 
 
 [92]
 Compare Nixon, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 rev'g sub nom. Mitchell, 551 F.2d 1252 (tape recordings)
 
 
 [93]
 See text at notes 108-111, infra
 
 
 [94]
 We note that in the original Rule 41(e) proceedings brought by the Church in California the California federal courts took the precaution of prohibiting all public disclosure while the issue was pending within the ninth circuit. See note 6, supra
 
 
 [95]
 See note 96, infra
 
 
 [96]
 We have described in text and notes above the tortuous proceedings by which the seized documents were made a part of the record in the criminal proceedings and came to reside in the custody of the district court here. Although the defendants urged the court to examine the documents, none of those at issue was read into the record in haec verba nor was any used in the examination of witnesses by either the government or the defense. The defense prepared, introduced and examined a witness concerning a study which purported to classify all documents seized as within or without the scope of the warrant. A computerized catalogue of seized materials, which was the basis for the study, was also made a part of the record but neither the study nor the catalogue revealed or even described the contents of the documents. The documents made a part of the stipulated record for trial and the documents used in the examination of witnesses at the suppression hearing are not among those at issue on this appeal. See note 21, supra. In addition, the content of those at issue was not described either generally or specifically in the trial judge's decision on the motion to suppress, nor so far as we can tell were they described in any papers filed in the district court proceedings. The seized documents were under the seal of this district court from the moment they were made a part of the record until the court acted upon the unsealing orders here at issue and no member of the public, by attending courtroom proceedings or by reading the decisions of the district judge or the motions or other papers filed by the parties, could have determined their contents. As a practical matter these documents had not already entered the public domain through the criminal court proceedings. Furthermore, nothing before us now suggests that their confidentiality had been impaired by use in the federal courts in California. See note 6, supra
 
 
 [97]
 Those portions of the "White House tapes" to which the media sought access in Mitchell, 551 F.2d 1252, rev'd sub nom. Nixon, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 had already been publicly played to the limited number of spectators who were able to find space in Judge Sirica's "cramped courtroom." See Nixon, 435 U.S. at 593 n.3, 594, 98 S.Ct. at 1309 n.3, 1310; Mitchell, 551 F.2d at 1258
 
 
 [98]
 See Okla. Publishing Co. v. Dist. Court, 430 U.S. 308, 310-11, 97 S.Ct. 1045, 1046-47, 51 L.Ed.2d 355 (1977) (press may not be restrained from publishing photograph and information obtained in and around courtroom proceedings when they were not in fact excluded from courtroom); Cox Broadcasting Co. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (press may not be made liable for publishing name of rape victim whose name was already publicly available)
 
 
 [99]
 Acknowledging the relevance of previous access raises the question whether on remand the fact of access while this appeal was pending should enter into a determination whether public access should now be permitted. We think it should not. To employ the language used in the text, we do not think the materials were "formerly properly accessible." To permit this mode of access to factor into a subsequent evaluation of the interests at stake would only compound the errors we perceive in the court's original orders
 Because we conceive of the interests asserted as a continuum which can be further invaded with each passing day by a single and unchanging encroachment, we do not think the case has become moot. Cf. Walter v. United States, 447 U.S. 649, 659 n.13, 100 S.Ct. 2395, 2403, 65 L.Ed.2d 410 (1980) (continuing fourth amendment privacy interest in package mistakenly delivered to and opened by third party before delivery to FBI) ("A partial invasion of privacy cannot automatically justify a total invasion."); Nixon, 435 U.S. at 602-03, 98 S.Ct. at 1314-15 (but for Presidential Recordings Act Court was prepared to balance privacy interests in recordings already publicly played against public interest in access). See Cell Assoc., Inc. v. Nat'l Inst. of Health, 579 F.2d 1155, 1157 (9th Cir. 1978) (Privacy Act claim not mooted by public disclosure of materials and widespread comment by press). We do not now address the rights of the press or the public to make use of copies of the documents obtained through the court while access was permitted.
 We treat the question whether public access should be granted to particular documents which have already entered the public domain through other channels under our discussion of the "particularized interests" at stake, infra, note 112 and accompanying text.
 
 
 [100]
 The government appears to suggest that the individual defendants' reluctant acquiescence to the trial court's warnings that he reserved the power and discretion to unseal the documents whenever he wished constitutes a waiver of objection to disclosure. Brief for Appellee in No. 79-2312 at 10; Brief for Appellee in Nos. 79-2313 & 79-2324 at 10-11. We disagree. Although we think the defendants' position could have been more forcefully stated and more assiduously pursued, we do not think their acquiescence constitutes a waiver of their underlying substantive objection. See Tr. Jul. 18, 1979 quoted supra, note 9. Even if we were to hold that the Church had notice of the trial judge's position through the defendants or through common counsel, the uncertainty of its procedural right to assert an interest in retaining the documents under seal, as well as the uncertainty of eventual unsealing would foreclose a finding of waiver by the Church based on notice of the trial judge's repeated warnings
 
 
 [101]
 See generally Andresen v. Maryland, 427 U.S. at 482 n.11, 96 S.Ct. at 2749 quoted in part, supra, text following note 37. But see Zurcher v. Stanford Daily, 436 U.S. 547, 562 n.9, 98 S.Ct. 1970, 1980 n.9, 56 L.Ed.2d 525 (1978) (rejecting rule requiring government to proceed by subpoena for materials held by third party not suspected of crime): "We reject totally the reasoning of the District Court that additional protections are required to assure that the Fourth Amendment rights of third parties are not violated because of the unavailability of the exclusionary rule as a deterrent to improper searches of premises in the control of nonsuspects." We, of course, have no occasion to pass upon the lawfulness of the underlying search in this case. The minimization of intrusion which we address is that which may be effected by careful exercise of the trial court's supervisory authority over public access to the fruits of a search and seizure held in that court's custody
 
 
 [102]
 E. g., County of Kern v. Superior Court, 82 Cal.App.3d 396, 401, 147 Cal.Rptr. 248, 251 (1978) (in resisting discovery of records hospital may not assert California constitutional privacy right of doctors); Hendrickson v. Cal. Newspapers, Inc., 48 Cal.App.3d 59, 62, 121 Cal.Rptr. 429, 431 (1975) (deceased's relatives may not assert California constitutional privacy right in publication of deceased's criminal conviction). Cf. United States v. Salvucci, 448 U.S. 83, 86, 100 S.Ct. 2547, 2550, 65 L.Ed.2d 619 (1980) (in seeking suppression of fruits of search, defendant may not assert another's expectations of privacy); United States v. Payner, 447 U.S. 727, 729, 100 S.Ct. 2439, 2443, 65 L.Ed.2d 468 (1980) (same); Rakas v. Ill., 439 U.S. 128, 138-40, 99 S.Ct. 421, 427-28, 58 L.Ed.2d 387 (1978) (same). But see Griswold v. Conn., 381 U.S. at 481, 85 S.Ct. at 1679 (physician and directors of planned parenthood league may assert constitutional rights of married persons with whom they had professional relationship); Comm'r v. Mun. Court, 100 Cal.App.3d 69, 161 Cal.Rptr. 19 (1979) (in resisting discovery of names of arrested persons Highway Patrol may assert California constitutional privacy right of arrestees)
 
 
 [103]
 See text at notes 23-53, supra
 
 
 [104]
 The documents are of course presumed to be the property of the Church, from whom they were seized, and if the government contends otherwise, it carries the burden of proof. See United States v. Wright, 610 F.2d at 939 ("seizure of property from someone is prima facie evidence of that person's entitlement") (emphasis in original); United States v. Palmer, 565 F.2d at 1065 ("We conclude that in absence of any cognizable claim of ownership or right to possession adverse to that of appellant, the district court should have granted appellant's motion and returned to him the money taken from him by government seizure.")
 The privacy interests asserted, though perhaps not presumptively protectible, are equally strong on this record. In fourth amendment terms, the reasonability of the Church's expectation of privacy in the areas searched is unquestionable on this record. See G.M. Leasing Corp. v. United States, 429 U.S. at 354, 97 S.Ct. at 629; Coolidge v. N. H., 403 U.S. 443, 474-75, 91 S.Ct. 2022, 2042-43, 29 L.Ed.2d 564 (1971). See also Payton v. N. Y., 445 U.S. 573, 584-593, 100 S.Ct. 1371, 1379-83, 63 L.Ed.2d 639 (1980). But cf. Pearson v. Dodd, 410 F.2d at 704-06 (no actionable claim for invasion of privacy stated by United States Senator against newspaper columnists who publicized information derived from copies of documents taken from Senator's office without Senator's knowledge or authorization by Senator's staff members and former staff members).
 
 
 [105]
 See note 102, supra. See also note 50, supra
 
 
 [106]
 See text at note 84 and note 84, supra
 
 
 [107]
 The defendants' argument that disclosure would jeopardize fair trial rights was rejected by the district court in the following analysis:
 The government has indicated that other criminal prosecutions based on the documents seized in California may be forthcoming. Moreover, there are two defendants who will have to stand trial before this Court if they are extradited from Great Britain. The defendants contend that release of the documents will taint their ability to receive fair trials. With respect to prosecutions in other jurisdictions, the defendants concern is merely hypothetical. The Court has no hard information that other prosecutions will be forthcoming, but even if this happens that can be dealt with at a later day by another court or this one. If court records were kept sealed on such "potential" grounds, none would ever be released. With respect to the other two defendants awaiting extradition, most of the alleged "taint" against them may result from the records attached to the stipulated record and these records are not at issue on the instant motion. Furthermore, with respect to all other criminal proceedings, if any, a careful voir dire can be used to eliminate any prejudice. United States v. Haldeman, 559 F.2d 31 (D.C.Cir.1976) (per curiam) (en banc) cert. denied, 431 U.S. 933 (, 97 S.Ct. 2641, 53 L.Ed.2d 250) (1977).
 United States v. Hubbard, Cr. No. 78-401, slip op. at 4-5 (D.D.C. Oct. 30, 1979), Hubbard App. at 226-27.
 
 
 [108]
 See, e. g., Tehan v. United States ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966) (fourth and fifth amendments are concerned with "constitutional values . . . reflecting the concern of our society for the right of each individual to be let alone"); Mapp v. Ohio, 367 U.S. 643, 656-57, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961). See also Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)
 
 
 [109]
 Cf. Simmons v. United States, 390 U.S. 377, 389-94, 88 S.Ct. 967, 973-76, 19 L.Ed.2d 1247 (1968)
 
 
 [110]
 See generally McKenna, The Constitutional Protection of Private Papers: The Role of a Hierarchical Fourth Amendment, 43 Ind.L.J. 55 (1977); Note, Papers, Privacy and the Fourth and Fifth Amendments: A Constitutional Analysis, 69 Nw.U.L.Rev. 626 (1974)
 
 
 [111]
 See note 15, supra
 
 
 [112]
 The claim was specifically made as to two documents in a supplemental post-argument memorandum filed by the government in this court. "(W)hile the Church of Scientology has sought to have this Court order that all documents in the Clerk's custody be re-sealed, on the ground that public accessibility to these documents constitutes an invasion of Church members' privacy, the Church itself has selectively chosen to publish certain of those documents for the apparent purpose of demonstrating to that same public that the Church and its members have been victims of governmental harrassment." Supplemental Memorandum for Appellee in Nos. 79-2313 & 79-2324 at 2
 
 
 [113]
 In his oral ruling denying the Church's application for temporary relief, Judge Richey stated:
 (T)here has been no determination as to which of the documents in the court's custody at this time are subject to forfeiture, or may later be subject to forfeiture.
 There are allegations that many of the documents were stolen from government agencies and private organizations.
 No documents will be returned, or can be returned, until such a determination can be made.
 Transcript of proceedings, Church of Scientology of Cal. v. United States, Civ.No. 79-2975, Nov. 2, 1979 at 52, Church App. Doc. 11.
 However, in considering the presumptive owner's right to return of seized property this court cautioned in United States v. Wilson, 540 F.2d at 1104:
 It goes without saying, that if the Government seeks to forfeit the property a proper proceeding should be instigated to accomplish that purpose. A claim by the owner for the return of his property cannot be successfully resisted by asserting that the property is subject to forfeiture. If the property is subject to forfeiture, appropriate proceedings should be started expeditiously.
 (citation and footnote omitted) (emphasis in original).
 
 
 [114]
 In Nixon, 438 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570, the tapes sought had already been carefully screened in camera for their relevance to the crimes charged, see Nixon v. United States, 418 U.S. 683, 713-716, 94 S.Ct. 3090, 3110-11, 41 L.Ed.2d 1039 (1974); United States v. Mitchell, 386 F.Supp. at 642, and had been introduced in evidence during trial of the charges. See note 97, supra
 
 
 [115]
 See generally Fed.R.Crim.P. 32(c)(3). But see McLauchlan, Privacy and the Presentence Report, 54 Ind.L.J. 347 (1979)
 
 
 [116]
 As suggested above, the potential for prejudice inherent in the documents' release must be assessed with specific reference to the documents' contents. The possibility of prejudice is thus another "particularized" interest which may be asserted to deny public access
 In the district court neither the Church nor the individual defendants attempted to itemize their interests in particular documents. Given the time constraints under which their arguments were fashioned and presented and the extremely large number of documents at issue, this is understandable.
 
 
 [117]
 United States v. Hubbard, Cr. No. 78-401, slip op. at 6 (Oct. 30, 1979), Hubbard App. at 228
 
 
 [118]
 Evidentiary privileges serve to protect at least some aspects of the amorphous concept of privacy. See McCormick's Handbook of the Law of Evidence 157 (2d ed. E. Cleary ed. 1972):
 (P)rivileges have survived largely unaffected by . . . (the criticisms of) eminent scholars and jurists who saw them as suppressing the truth, for it is evident that for many people, judges, lawyers and laymen, the protection of confidential communications from enforced disclosure has been thought to represent rights of privacy and security too important to relinquish to the convenience of litigants.
 
 
 [119]
 Concerning privacy tort actions against the press, Professor Emerson has suggested that
 protection . . . be extended only to matters related to the intimate details of a person's life: those activities, ideas or emotions which one does not share with others or shares only with those who are closest. This would include sexual relations, the performance of bodily functions, family relations, and the like.
 Emerson, The Right of Privacy and Freedom of the Press, 14 Harv.C.R.-C.L.L.Rev. 329, 343 (1979). However, as noted earlier, he has also suggested a broader scope of protectible privacy against governmental activity. See note 44, supra.
 
 
 [120]
 Andresen v. Maryland, 427 U.S. at 482 n.11, 96 S.Ct. at 2749 n.11
 
 
 [121]
 It is in the nature of our judicial process that we decide only the few questions presented by the facts of the case before us. This case presents narrow questions which we have undertaken to answer above. Nevertheless, we are acutely aware of the proximity, gravity and difficulty of several questions not answered. In particular, we wish to emphasize that we do not decide: (1) The rights of defendants or any third party to exclude the public from the courtroom conduct of a criminal case or from the records of the trial of criminal charges; (2) The public right of access to seized materials used for any purpose other than to demonstrate on a motion to suppress, the unlawfulness of the search; and (3) The procedural and substantive rights of third parties who seek to assert a privacy interest in materials not compulsorily taken from their persons or premises
 
 
 [122]
 For the reasons given, supra, note 63, we affirm that portion of the order appealed in No. 79-2324 which may be read to deny on the merits immediate return of the documents seized
 
 
 [1]
 Hereinafter sometimes referred to as the "Church" or "Church of Scientology."
 
 
 [2]
 The Church of Scientology attempted to impose an "agreement" on the trial court to retain the documents under seal. If the action taken was within the parameters of the trial court's inherent power over the proceedings before it, as I conclude, then the wishes of the defendants, even if acceded to by the government, did not in any way restrain the court. Parties do not by their agreements limit the powers of the court. Nor do parties "contract" with the court, as the record reflects the criminal defendants attempted to do. Parties legitimately, of course, make requests of the court through the medium of motions, which are applications for an order. That should not be confused with a power to dictate the actions of the court
 
 
 [3]
 There is the additional issue of the Church's right to intervene in a pending criminal proceeding. That question is addressed in part III of this dissent, infra
 
 
 [4]
 In a memorandum dated October 30, 1979, filed in response to the defendants motion for reconsideration of the unsealing order the trial judge expressly stated that during the suppression hearing "all of the documents seized in Los Angeles were put into evidence by the defendants." (JA 223, 224) (emphasis in original) That same order makes an explicit reference to the need to review the entirety of the material relating to "sex lives of members of the Church, tax returns of individuals, and attorney-client material of law firms." JA 228. The final paragraph of the memorandum states that it is
 "Further Ordered, that the seal shall remain on documents not used by the parties for examination of witnesses at the suppression hearing until the Court examines each in light of issues raised by the defendants, and, the Court will begin such process today." JA 228 (emphasis added).